**UNITED STATES of America, Appellee,**

v.

**Carmine AVELLINO, Defendant–Appellant.**

**No. 309, Docket 97–1117.**

United States Court of Appeals, Second Circuit.

Argued Oct. 9, 1997.

Decided Jan. 30, 1998.

Order on Petition for Rehearing April 23, 1998.

Stephen D. Kelly, Assistant United States Attorney, Brooklyn, NY (Zachary W. Carter, United States Attorney for the Eastern District of New York, Susan Corkery, Assistant United States Attorney, Brooklyn, NY, on the brief), for Appellee.

Jay Goldberg, New York City (Brian D. Linder, Clayman & Rosenberg, New York City, on the brief), for Defendant–Appellant.

Before: KEARSE and CABRANES, Circuit Judges, and CHIN, District Judge.*

KEARSE, Circuit Judge:

Defendant Carmine Avellino appeals from a judgment entered in the United States District Court for the Eastern District of New York following his plea of guilty before Frederic Block, *Judge*, convicting him of conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (1994). The district court sentenced Avellino principally to 126 months'

* Honorable Denny Chin, of the United States District Court for the Southern District of New York, sitting by designation.

imprisonment, to be followed by a three-year term of supervised release, and ordered him to pay a fine of $60,000, plus the cost of imprisonment and supervised release up to $190,000. After entering his plea of guilty but prior to being sentenced, Avellino moved under Fed.R.Crim.P. 32(e) to withdraw his plea on the ground that he had recently become aware of evidence with which he could have impeached the main witness against him, and that that evidence had been known to the government but had been withheld. The district court denied the motion principally on the ground that the evidence was not material. On appeal, Avellino challenges the denial of his motion. Finding no basis for reversal, we affirm.

## I. BACKGROUND

Avellino was one of eight alleged members or associates of the Luchese Crime Family of La Cosa Nostra who were indicted in 1994 by a federal grand jury in the Eastern District of New York and charged with numerous offenses, including racketeering, conspiracy, extortion, and murder. Avellino, charged with eight offenses, initially pleaded not guilty on all counts. The pretrial discovery process began in early 1995. The events during that process are not substantially in dispute.

### A. Pretrial Discovery and Avellino's Guilty Plea

In discovery, the government disclosed that the main witness against Avellino would be Alphonso D'Arco, former acting boss of the Luchese Family. D'Arco had entered into a cooperation agreement with the government in 1992, pursuant to which he pleaded guilty to RICO conspiracy and agreed to cooperate with the government. In return, D'Arco and 10 of his relatives or in-laws were accepted into the federal witness protection program and given certain immunities from prosecution, and the government agreed, *inter alia*, not to seek a sentence for D'Arco of more than 20 years. It also agreed to move pursuant to § 5K1.1 of the Sentencing Guidelines for a downward departure if D'Arco's cooperation proved satisfactory. By the time Avellino was indicted, D'Arco had testified at

several trials and before at least one grand jury. The government provided Avellino with extensive information relating to D'Arco, including transcripts of his testimony at those trials, voluminous records of his interviews with agents of the Federal Bureau of Investigation ("FBI"), records surrendered by D'Arco when he began cooperating with the government, the transcript of D'Arco's plea hearing, and additional information concerning his plea agreement and prior misconduct. The disclosed materials implicated D'Arco in, *inter alia*, numerous murders, attempted murders, and conspiracies to commit murder, as well as extortion, loansharking, arson, hijacking, counterfeiting, mail and wire fraud, narcotics trafficking, and obstruction of justice. D'Arco had twice been convicted and served terms in prison, once in connection with a scheme involving stolen stock certificates, and once for possession of, and conspiracy to distribute, heroin.

These materials also revealed, *inter alia*, that although D'Arco admitted having engaged in drug-related activity for more than a decade prior to his 1983 narcotics conviction, and had admitted at his plea hearing to running the day-to-day activities of the Luchese Crime Family, one of which was the distribution of drugs (Plea Hearing Transcript, *United States v. D'Arco*, CR–92–0413 (S.D.N.Y. May 15, 1992) ("*D'Arco* Tr."), at 5, 10, 13), he testified at the prior trials that he personally had ceased drug-related activities in 1982 when he became a member of the Luchese family. For example, D'Arco testified in *United States v. Amuso*, CR–90–446 (E.D.N.Y. May 26, 1992), and *United States v. Giampa*, S92–CR–437 (S.D.N.Y. October 26, 1992), that he never dealt in narcotics after becoming a member of the Luchese Crime Family in 1982, and that his 1983 arrest and conviction were for narcotics offenses committed before he became a member; in *United States v. Massaro*, S1–92–CR–529 (S.D.N.Y. October 6, 1993), he testified that when he engaged in selling drugs, he was not a member of the Luchese family. The materials given to Avellino by the government apparently contained no information directly contradicting D'Arco's denials of personal involvement in selling drugs after he joined the Luchese Crime Family.

In February 1995, pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Avellino made various discovery demands of the government. Asserting, without elaboration, a "good faith belief" that D'Arco had engaged in narcotics activities between 1981 and 1991, when he apparently became a confidential informant, Avellino asked that inquiry be made of the Drug Enforcement Administration ("DEA") and the FBI to determine whether there was any evidence as to such activity by D'Arco. By letter to defense counsel dated April 3, 1995, the government responded that it was unaware of any such evidence. It added, "[i]f you provide the government with the basis for your 'good faith belief' to the contrary, we will investigate the matter further to the extent warranted by any information you provide." (Government's April 3, 1995 letter to counsel for all defendants at 9–10.)

In a July 21, 1995 letter from his attorney Brian D. Linder to Assistant United States Attorney ("AUSA") James Orenstein, Avellino renewed his request, stating that the basis for his "good faith belief" that D'Arco had engaged in narcotics activity after he claimed to have ceased was an October 3, 1991 newspaper article which stated that D'Arco had become a federal informer and which quoted undescribed "sources" as having said that D'Arco had " 'good connections and contacts with Asian heroin merchants,' and 'could be very helpful in that area.' " (Gerry Capeci, "Luchese chief dying to sing for the feds," *Daily News*, Oct. 3, 1991, at 3.) Avellino's letter requested any evidence tending to substantiate the statements quoted in the article. The government did not produce any evidence in response to this letter, taking the position that a news article attributing the quoted statements to unnamed and undescribed "sources" was insufficient to warrant investigation.

In May 1996, after several months of negotiations among the government and the defendants, Avellino entered into a plea agreement with the government, pursuant to which he agreed to plead guilty to one substantive RICO count, and the government agreed to drop the remaining charges. The plea was part of a "global settlement," with acceptance of Avellino's plea and those of two of his codefendants being somewhat interdependent, and the plea agreements of two

additional codefendants containing provisions that were contingent on the entry of pleas by Avellino and still other codefendants on or before June 3, 1996.

Pursuant to his plea agreement, Avellino pleaded guilty on May 29, 1996. Sentencing was set for October.

### B. *Avellino's Motion To Withdraw His Plea*

By motion dated September 30, 1996, Avellino moved pursuant to Fed.R.Crim.P. 32(e) to withdraw his plea of guilty. The basis stated for the motion was that after Avellino entered his guilty plea, his counsel had obtained a document indicating that the government had been aware of, but had failed to disclose, information concerning D'Arco's involvement in narcotics transactions in the period 1989–1991. The document was an Affirmation by New York County Assistant District Attorney Daniel M. McGillycuddy dated October 24, 1991 (the "McGillycuddy Aff."), submitted to the New York State Supreme Court to request an order allowing postponement of the required notice, *see* N.Y.Crim.Proc.Law § 700.50 (McKinney 1995), to persons whose conversations had been intercepted during court-authorized electronic eavesdropping in a designated block of Prince Street in New York City (the "Prince Street warrant"), in a then-ongoing investigation by the District Attorney's office (the "State investigation").

The Prince Street warrant, issued initially in June 1989 and extended through October 1989 after further findings of probable cause, authorized interception of communications among "Ralph Cuomo, Alfonso [*sic*] D'Arco" and several others "relating to the crimes of criminal sale of a controlled substance ... and conspiracy to commit those crimes." (McGillycuddy Aff. ¶ 2.) The State investigation had also led to the issuance, and two extensions, of a warrant authorizing interception of communications in a certain automobile between D'Arco and another, relating to the same narcotics offenses mentioned in the Prince Street warrant. (*Id.* ¶ 3.) The McGillycuddy Affirmation stated that the District Attorney's Office had been in contact with "federal authorities," with whom D'Arco

was cooperating at the time, concerning the federal officials' obtaining by court order evidence that had been gathered by means of the warrants issued in the State investigation. (*Id.* ¶ 14.)

Avellino's attorney stated that after receiving the McGillycuddy Affirmation, defense counsel had met with the government and had been informed by AUSAs in the Eastern District (a) that the evidence mentioned in that affirmation had been sent to the United States Attorney's office in the Southern District of New York (the "Southern District"), and (b) that though on the surveillance tapes D'Arco was heard discussing criminal activity, the Eastern District AUSAs, upon reviewing the tapes, did not interpret that activity as narcotics activity. In support of the plea withdrawal motion, defense counsel argued that the issuance and extensions of the warrants showed that probable cause had been established repeatedly, to the satisfaction of a neutral state-court judge, to believe that D'Arco had been engaged in narcotics activity in 1989, and that the contents of the McGillycuddy Affirmation demonstrated that the federal government had been aware of the existence of the State investigation and the evidence gathered therein (the "State evidence"). After obtaining materials referred to in the McGillycuddy Affirmation, defense counsel also eventually pointed to several instances in which experienced State investigators had opined that the observed conduct of D'Arco indicated that he had been engaged in discussing, negotiating the sale of, transferring, and taste-testing, narcotics.

In an undated declaration, Avellino stated that he would not have pleaded guilty had he known of the State evidence indicating that D'Arco was involved in narcotics activity after 1982, for that evidence could have established at Avellino's trial that D'Arco had deliberately lied to the government and to other juries.

### C. *The Government's Response and the District Court's Decision*

The government opposed Avellino's motion, submitting affidavits from Orenstein, who had been lead prosecutor in this case from 1995 through September 1996, and Stephen D. Kelly, who had been assigned to the case since September 1995. The government maintained that "the prosecutors assigned to

this case were not aware of nor in possession of the[ ] state materials during pretrial discovery." (Affidavit of Stephen D. Kelly dated November 13, 1996 ("Kelly Aff.") ¶ 1.) Orenstein stated that he had not been aware of the McGillycuddy Affirmation, or of the State investigation referred to in that affirmation, prior to September 1996. He stated that he had generally been aware prior to Avellino's plea of guilty that the New York County District Attorney's office had conducted an investigation of Cuomo and others and had conducted electronic surveillance; but he had not known "until this matter was raised by Avellino's counsel that Alfonso [sic] D'Arco was named in the applications for electronic surveillance in that state investigation or that he was a subject of that investigation." (Affidavit of James Orenstein dated November 12, 1996, ¶ 3.)

Kelly likewise stated that until September 1996, he had not seen the McGillycuddy Affirmation or the materials it discussed, and he had not been aware of the State investigation. Following the submission of Avellino's motion to withdraw his plea, Kelly had obtained and reviewed copies of the State materials. He also spoke to AUSAs in the Southern and Eastern Districts to determine when, respectively, the materials had come into their possession. He learned that portions of the State materials had been received and reviewed by AUSAs in the Southern District in or about 1992, when D'Arco was cooperating with the Southern District. Those AUSAs had determined that "the State materials were not inconsistent with D'Arco's information provided during his cooperation." (Kelly Aff. ¶ 6.) In addition, Kelly learned that in 1995, the Southern District had been conducting an investigation of Cuomo, and the Eastern District had been contemplating such an investigation. The New York County District Attorney's office furnished the State evidence to both offices; but before the Eastern District opened the boxes, the Southern District indicted Cuomo, see United States v. Cuomo, 95 CR 900 (AGS) (S.D.N.Y.), and the Eastern District abandoned its contemplated investigation and left the boxes of State materials unopened:

As a result, the state materials were not reviewed by any Eastern District AUSA at that time, and the state materials remained unopened in the files of an Eastern District AUSA until Avellino filed his motion to withdraw his plea in this case. (Id. ¶ 7.) The government also proffered non-narcotics-related explanations for each of the actions of D'Arco observed by the State investigators and characterized by those investigators as indicative of narcotics activity.

In a Memorandum and Order dated January 8, 1997 ("Order"), the district court, noting that Avellino's declaration in support of his motion contained no suggestion that Avellino was innocent, denied the motion to withdraw the plea. Observing that the Brady v. Maryland disclosure obligation encompasses only evidence that is material, the court held that the previously undisclosed State evidence did not meet that standard. It noted that an abundance of "devastating impeachment material" had been timely produced, and Avellino was well aware that D'Arco had admitted involvement in a panoply of serious crimes, including narcotics trafficking, arson, extortion, labor racketeering, hijacking, burglary, fraud, and nine murders. Thus, in light of the evidence already produced, the State evidence would have been cumulative. Order at 2-3. The court concluded that there was no "reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but would have insisted on going to trial." Id. at 2 (internal quotation marks omitted). The court also found that if the plea were withdrawn there would likely be significant prejudice to the government because it would be required to prepare for a complex trial after an eight-month hiatus and because the pleas entered by the codefendants who had participated in the global settlement might well be affected.

The motion was denied; Avellino was sentenced as indicated above; and this appeal followed.

## II. DISCUSSION

On appeal, Avellino contends that the government was constructively aware of the State evidence, that that evidence was material because it provided strong ammunition for impeachment of D'Arco, and that the government's failure to disclose that evi-

dence thus violated its obligations under *Brady v. Maryland,* thereby entitling Avellino to withdraw his plea. Although Avellino raises interesting questions with regard to the possible imputation of knowledge to the prosecution as to the nature of the State evidence, we ultimately reject his claim because we agree with the district court that the undisclosed evidence was not material.

A. *The Government's Obligation To Disclose Material Evidence*

■ To the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant. *See, e.g., Kyles v. Whitley,* 514 U.S. 419, 431, 115 S.Ct. 1555, 1564, 131 L.Ed.2d 490 (1995); *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196–97 (*"Brady"*) (suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). Information coming within the scope of this principle (*"Brady* matter") includes not only evidence that is exculpatory, *i.e.,* going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.,* having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. *See, e.g., Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ("jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence").

■ The government's obligation to make such disclosures is pertinent not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty. The defendant is entitled to make that decision with full awareness of favorable material evidence known to the government. *See, e.g., Tate v. Wood,* 963 F.2d 20, 24 (2d Cir.1992). Although a guilty plea is generally considered valid so long as the plea was intelligent and voluntary, *see, e.g., Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468–69, 25 L.Ed.2d 747 (1970); *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1969), the validity of the plea must be reassessed if it resulted from "impermissible conduct by state agents," *Brady v. United States,* 397 U.S. at 757, 90 S.Ct. at 1473. Impermissible conduct includes *Brady* violations. *See, e.g., Miller v. Angliker,* 848 F.2d 1312, 1320–23 (2d Cir.), *cert. denied,* 488 U.S. 890, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988). Thus, we have noted that where prosecutors have withheld favorable material evidence, "even a guilty plea that was 'knowing' and 'intelligent' may be vulnerable to challenge." *Id.* at 1320 (holding that *Brady* violation invalidated agreement to plead not guilty by reason of insanity); *see Tate v. Wood,* 963 F.2d at 24–25 (remanding for evidentiary hearing with respect to effect of nondisclosure on agreement to plead guilty).

■ The *Brady* obligation extends only to material evidence (*see* Part II.B. below) that is known to the prosecutor. *See Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. at 1567. An individual prosecutor is presumed, however, to have knowledge of all information gathered in connection with his office's investigation of the case and indeed "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.; see United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995). Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis." *United States v. Gambino,* 835 F.Supp. 74, 95 (E.D.N.Y.1993), *aff'd,* 59 F.3d 353 (2d Cir.1995), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996). Thus, in *United States v. Locascio,* 6 F.3d 924 (2d Cir.1993) (*"Locascio"*), *cert. denied,* 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994), we refused to impute to the AUSAs prosecuting that action knowledge of reports prepared by FBI agents who

were "uninvolved in the investigation or trial of the defendants-appellants." *Id.* at 949 ("We will not infer the prosecutors' knowledge simply because some other government agents knew about" the evidence.). In *United States v. Quinn*, 445 F.2d 940 (2d Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971), we refused to impute the knowledge of a Florida prosecutor to an AUSA in New York, rejecting as "completely untenable [the] position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor.'" *Id.* at 944.

In the present case, Avellino argues that the government should be charged with constructive knowledge of the evidence gathered in the State investigation prior to the government's plea agreement with Avellino, in part because that evidence was present in the office of an AUSA in the very district in which Avellino's case was contemporaneously being prosecuted. Further, Avellino points out that although AUSA Orenstein may have been unaware that the State materials targeting Cuomo also focused on D'Arco, AUSA Mark E. Feldman, Orenstein's supervisor who in 1996 was Chief of the Eastern District's Organized Crime and Racketeering Section and who signed the plea agreement with Avellino, had been, in 1990, one of the New York County Assistant District Attorneys who supervised the State investigation. Thus, Avellino argues that the pertinent Eastern District prosecutors had reason to know that the unopened boxes of State materials contained information with respect to the 1989–1991 narcotics investigation of which D'Arco was a target.

Avellino's arguments raise a number of troublesome questions. The district court, because of its conclusions that the undisclosed information was not material and that withdrawal of the plea would likely cause the government significant prejudice, did not reach the question of the AUSAs' knowledge, actual or constructive. Were this Court in disagreement with the district court's assessment of materiality, we would likely remand for further proceedings to explore those questions. However, since we conclude, for the reasons stated in the sections that follow, that the undisclosed information does not meet the test for *Brady* materiality, we see no need to reach the questions of actual or constructive knowledge, and, accordingly, no need for a remand.

### B. *Materiality*

If the government has failed to disclose to the defendant evidence favorable to him, relief is warranted only if the evidence was "material." *See, e.g., United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. at 433–34, 115 S.Ct. at 1565 (internal quotation marks omitted); *see also United States v. Wallach*, 935 F.2d 445, 458 (2d Cir.1991).

■ In the context of an attack on the validity of a plea, evidence is considered material where "there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." *Tate v. Wood*, 963 F.2d at 24; *see Miller v. Angliker*, 848 F.2d at 1322. Assessment of that question involves an objective inquiry that asks not what a particular defendant would do but rather what is "the likely persuasiveness of the withheld information." *Id.* *See also United States v. Payne*, 63 F.3d at 1209 (materiality is a mixed question of fact and law, and the reviewing court, while giving substantial deference to the district court's findings of historical fact, bases its determination of materiality on an independent examination of the record).

■ In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime. *See, e.g., Giglio v. United States*, 405 U.S. at 154–55, 92 S.Ct. at 766 (remanding for new trial where government's case depended "almost entirely" on a witness as to whom impeaching evidence was not disclosed); *United States v. Sperling*, 506 F.2d 1323, 1334–40 (2d Cir.1974) (remanding for new trial of those defendants as to whom the key witness's testimony was uncorroborated; affirming as to defendants as to whom there was corroboration). Similarly, impeaching

matter may be found material where the witness supplied the only evidence of an essential element of the offense. *See, e.g., United States v. Badalamente*, 507 F.2d 12, 18 (2d Cir.1974) (undisclosed impeachment evidence was material where witness's testimony bore directly on jury's choice between government's conspiracy theory and defendant's entrapment defense), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975). This is especially true where the undisclosed matter would have provided the only significant basis for impeachment. *See, e.g., United States v. Wallach*, 935 F.2d at 457–58 (where witness who was the "centerpiece of the government's case" and "the only witness who the jury was led to believe had undergone a radical moral transformation," deliberately perjured himself as to the cessation of his gambling addiction, new trial was ordered because "had the jury been aware of [the witness's] perjury it probably would have acquitted the defendants").

◼ Undisclosed impeachment evidence is not material in the *Brady* sense when, although "possibly useful to the defense," it is "not likely to have changed the verdict." *Giglio v. United States*, 405 U.S. at 154, 92 S.Ct. at 766 (internal quotation marks omitted). For example, where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material. *See, e.g., United States v. Helmsley*, 985 F.2d 1202, 1210 (2d Cir.1993); *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir.1987); *United States v. Rosner*, 516 F.2d 269, 273–74 (2d Cir.1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). In this context, three recent decisions of this Court involving motions for new trials "in the interest of justice," Fed. R.Crim.P. 33, on the ground that the government had failed to meet its *Brady* obligations to disclose impeachment evidence with respect to its key witness Salvatore Gravano, *see United States v. Gambino*, 59 F.3d 353, 363–67 (2d Cir.1995) ("*Gambino*"), *cert. denied*, 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996); *United States v. Orena*, 32 F.3d 704, 717 (2d Cir.1994) ("*Orena*");

and *Locascio*, 6 F.3d at 948–50 (collectively the "Gravano cases"), are particularly instructive.

In *Gambino*, the undisclosed evidence included a tape recording of Gravano teaching an associate how to deceive a grand jury, including instructing that "[t]en percent [of the time], you out and out lie." 59 F.3d at 364. Despite characterizing the tape as "quintessential" impeachment evidence, *id.* at 366, we concluded that it was not material. We noted that Gravano had acknowledged participating in 19 murders, that "at least two of those murders [were committed] in order to prevent the victims from testifying before a grand jury," and that he had "admitted other acts of obstructing justice, including bribing jurors." *Id.* In light of the disclosed evidence, the tape was not material, for the "grim history" that Gravano had acknowledged afforded the jury "a fair opportunity to evaluate the witness's credibility." *Id.*

The other undisclosed *Brady* information at issue in *Gambino* was a letter from one Pasquale Conte implicating Gravano in narcotics trafficking. Defense counsel argued that the letter could have been used to show that Gravano had perjuriously denied such trafficking when testifying at other trials and that the jury thus should not credit his testimony in the *Gambino* trial. We found the letter not to be material in the constitutional sense:

In the instant case the *Conte* letter—not turned over to defense counsel—contradicted statements regarding the drug business to which Gravano had testified in other trials. Even assuming Gravano perjured himself and assuming perjury in other trials would be relevant to Gravano's testimony in this trial, we do not believe the *Conte* letter material in the constitutional sense. Had defense counsel had access to the letter, we do not believe it would likely have affected the outcome of the trial, or, in other words, that with the letter in evidence Gravano's credibility would have been so diminished that Gambino would not have been convicted.

*Id.* at 365. Under the standards applicable to *Brady* claims, we stated that

reversal is warranted only if there is a reasonable probability that disclosing the

*Conte* letter to the defense would have resulted in a different verdict. That test has not been met. As the district court noted, "Gravano's plea agreement with the government and his criminal past were dissected and laid before the jury on cross-examination—a criminal past which included nineteen murders, labor racketeering, extortion, shylocking, obstruction of justice and gambling." 835 F.Supp. at 88. Proof before the jury that this witness was involved in an abortive conspiracy to import heroin and that he violated the policies of his own organization would scarcely have rendered his gloomy past worse.

*Id.* at 365–66. *See also Orena,* 32 F.3d at 717 (in light of Gravano's "horrendous history of criminal activity," the belatedly disclosed information as to the possibility that Gravano had breached "the Mafia 'rule' against drug trafficking," despite his testimony at Orena's trial that the Mafia forbade such activities, "would not significantly have improved Orena's ability to undercut Gravano's credibility").

In *Locascio,* Gravano likewise testified to his commission of numerous crimes, including 19 murders. The *Brady* claim was based on newly-disclosed evidence that Gravano had been responsible for three additional murders. Gravano had not confessed these murders in his plea agreement, and he had not admitted them at trial; thus, the new evidence tended to show that Gravano had perjured himself at the *Locascio* defendants' trial. We concluded that no new trial was warranted because

Gravano had already confessed to numerous crimes, including murders, and was subject to withering cross examination for those actions. The addition of a few more allegations would not have materially affected the defense's cross examination of him.

*Locascio,* 6 F.3d at 949.

Thus, the Gravano cases teach that where there has been disclosure of an abundance of evidence of a witness's long history of brutality, rapacity, and mendacity, the belatedly disclosed evidence suggesting that the witness perjured himself by concealing additional crimes may be immaterial, whether that perjury occurred in the trial at issue on the appeal, as in *Locascio,* or in other trials, as hypothesized in *Gambino.*

In the present case, as in *Gambino,* Avellino argues that the undisclosed evidence would have permitted him to show that the government's key witness had perjured himself as a government witness at other trials. Here, as in all of the Gravano cases, however, the government had disclosed that the witness had an atrocious criminal record. Thus, D'Arco had already admitted his involvement in, in his own words, "[m]urder, high-jacking, burglary, arson, gambling," *United States v. Amuso,* CR–90–446, Trial Transcript p. 2349 (E.D.N.Y. May 26, 1992), "[a]rson, . . . murder, counterfeiting, loansharking, extortion, labor racketeering, . . . illegal union racketeering, threats, assaults, that type of activity," *United States v. Giattino,* CR–90–424, Trial Transcript p. 710 (E.D.N.Y. Nov. 2, 1992). At the prior trials he acknowledged that he twice had been convicted of crimes and had served prison terms, once for a scheme involving stolen stock certificates and once for possession of, and conspiracy to distribute, heroin. In addition, at his plea hearing, D'Arco acknowledged that the activities of the Luchese family also included various frauds and the "distribution of drugs," and he stated, *inter alia,* "I carried on the daily activities of the Luchese crime family; I passed on orders and I acted on orders, and . . . every day I took care of the affairs of the enterprise." (*D'Arco* Tr. at 5, 6, 7–8, 10, 13.) There was thus a wealth of disclosed evidence with which D'Arco could have been impeached.

Further, we are unpersuaded by Avellino's argument that the State evidence was material on the theory that its existence would reveal that D'Arco had a strong motive to testify favorably to the government, *i.e.,* the possibility that in light of D'Arco's perjured testimony, the government might consider his plea agreement void. Avellino has provided no basis for suggesting that the government threatened to withdraw from D'Arco's plea agreement. To the contrary, the government presented evidence that the AUSAs in the Southern District, the venue of several of the trials at which D'Arco had testified, had determined that "the State materials were not inconsistent with D'Arco's information provided during his cooperation." (Kelly Aff. ¶ 6.)

A defense argument that D'Arco was biased in favor of the government could, however, easily have been developed from the terms of the plea agreement itself, through cross-examination of D'Arco with respect to the significant benefits he had received and hoped to receive pursuant to that agreement. For example, by cooperating with the government, D'Arco had obtained for 10 of his relatives or in-laws, including his son who was also a member of the Luchese Crime Family, immunity from prosecution for various crimes. Further, the sentence D'Arco himself was to receive, despite his leadership of a La Cosa Nostra organized crime family and his array of acknowledged offenses, was quite favorable. In *Locascio,* for example, the boss and second-in-command of a different La Cosa Nostra organized crime family were convicted of RICO offenses, illegal gambling, obstruction of justice, conspiracies to commit extortion and murder, and murder, *i.e.,* offenses similar to those to which D'Arco owned up; they received sentences of life imprisonment. In *Orena,* the acting boss of a third La Cosa Nostra organized crime family was convicted of RICO offenses, firearms offenses, conspiracies to commit extortion and murder, and murder; he received multiple sentences of life imprisonment. At his own plea hearing, D'Arco acknowledged that even on the lone RICO offense to which he was pleading guilty, the court could sentence him to life in prison. (*D'Arco* Tr. at 8.) If, however, the government was satisfied with D'Arco's cooperation, his plea agreement guaranteed that the government would not seek a prison term of more than 20 years and that it would move for a downward departure. Regardless of any other evidence, D'Arco's powerful interest in satisfying the government with his assistance could easily have been brought home to the jury through the terms of his cooperation agreement.

A cross-examination of D'Arco by Avellino, using the disclosed information as to D'Arco's past crimes and his interest in testifying favorably for the government, might not have destroyed D'Arco's credibility; certainly prior juries that presumably heard that evidence, like the juries that had heard the similar array of crimes committed by Gravano, had returned verdicts of guilty. But we agree with the district court's conclu-

sions that there is no reasonable probability that additional information permitting an inference that D'Arco had committed perjury at past trials, by testifying that he had given up narcotics trafficking in order to join an organized crime family, would have changed the jurors' minds, and hence no reasonable probability that possession of such additional information would have led Avellino to elect to plead not guilty and to proceed to trial.

### 1. Cooperation Agreements

 Notwithstanding the traditional *Brady* framework, Avellino argues that dishonesty by a party to a cooperation agreement during the period of cooperation must be considered material in light of this Court's agreement with the government's own view of such acts:

> By lying to the prosecutor *during the period of his cooperation* about his own criminal involvement, Brechner made it impossible for the government to argue at any future trial that, despite his past sins, Brechner had acknowledged his guilt, turned over a new leaf and cooperated in a truthful and trustworthy manner. The disclosure of Brechner's lies to the bank officer's defense counsel under *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), would have brought on harsh cross-examination and a powerful argument that Brechner was no more trustworthy as a cooperating witness than he had been as a crook.

*United States v. Brechner,* 99 F.3d 96, 99–100 (2d Cir.1996) (emphasis in original). Given that this statement was made in the very different context of a cooperating defendant's assertion that the government had breached its contractual obligation to move for a downward departure pursuant to Guidelines § 5K1.1, we conclude that it does not alter the normal *Brady* analysis of materiality.

 Section 5K1.1 allows the district court to grant a defendant a downward departure from the sentencing range prescribed by the Guidelines if the government so moves on the ground that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense. In securing the assistance of a defendant, the government commonly enters into a cooperation

agreement that (a) requires the defendant to, *inter alia,* provide assistance to the government in the investigation or prosecution of others, and to answer truthfully all questions put to him by the government, and (b) provides that the government will make a § 5K1.1 motion if it is satisfied with the quality of the defendant's cooperation and with his performance of the terms of the agreement. *See, e.g., United States v. Fernandez,* 127 F.3d 277, 286 (2d Cir.1997); *United States v. Resto,* 74 F.3d 22, 25–26 (2d Cir.1996). The government normally retains considerable discretion to evaluate a defendant's assistance, and its refusal to move for a departure under Guidelines § 5K1.1 is reviewable only for misconduct, bad faith, or an unconstitutional motive, such as the defendant's race or religion. *See, e.g., Wade v. United States,* 504 U.S. 181, 185–86, 112 S.Ct. 1840, 1843–44, 118 L.Ed.2d 524 (1992); *United States v. Resto,* 74 F.3d at 26; *United States v. Gonzalez,* 970 F.2d 1095, 1103 (2d Cir.1992). We have ruled in a number of cases, including the *Brechner* case relied on by Avellino, that where the cooperation agreement required the defendant to be truthful, his subsequent lying to the government was a breach of the agreement and the government had the right under that agreement to refrain from making a § 5K1.1 motion. *See, e.g., United States v. Fernandez,* 127 F.3d at 286; *United States v. Brechner,* 99 F.3d at 99–100; *United States v. Pollack,* 91 F.3d 331, 334–35 (2d Cir.1996); *United States v. Resto,* 74 F.3d at 26.

In those cases, we simply applied principles of contract construction in assessing both whether untruthfulness by the defendant constituted a breach of the cooperation agreement and whether the defendant's conduct gave the government the right under the agreement to refuse to urge the court to give the defendant a lighter sentence. Our statement in *Brechner* that the witness's lies impeded the government from arguing, at any trial at which the witness testified, that he had "cooperated in a truthful and trustworthy manner," 99 F.3d at 100, was recognition that the utterance of such lies during the witness's period of cooperation may indeed be used for impeachment. We did not purport to suggest, however, that such impeachment information would be "material" trial evidence in the circumstances of every prosecution. The question for the present case is whether, in light of all the other information available with respect to D'Arco, there is any reasonable probability that the undisclosed impeachment information would have led Avellino to plead not guilty. For the reasons discussed above, we have concluded that there is no such reasonable probability. Our recognition in the § 5K1.1 cases that a witness's lying provides a basis for impeachment neither addressed the question of materiality generally nor alters our conclusion in this case.

### 2. *The Denial of an Evidentiary Hearing*

Avellino also contends that the district court should not have denied his motion without conducting an evidentiary hearing. In his brief on appeal, he argues that a hearing was necessary because it is not clear that the government gave him all of the evidence it had received from the State investigation. Given the record in this case, we reject his contention, for it is established that a defendant who seeks to withdraw his plea of guilty is not entitled to an evidentiary hearing on the basis of assertions that are simply conclusory. *See, e.g., United States v. Gonzalez,* 970 F.2d at 1100.

In the present case, any suggestion in the district court that there might be a need for a hearing was conclusory at best. There was no dispute with respect to Avellino's allegations that the government had not disclosed the State evidence to him prior to the entry of his plea, and his initial request for a hearing was entirely unexplained. Nor do we see any significant dispute as to the substance of the undisclosed information. Following the plea withdrawal motion, the government sent Avellino's counsel "copies of orders, applications, affidavits and line sheets" with respect to the State investigation and invited counsel to review "the tape recordings referred to in the line sheets." (Letter from AUSA Stephen D. Kelly to Jay Goldberg dated Nov. 13, 1996.) The government informed the court that it had "disclosed all the state materials in the possession of federal authorities to Avellino" (United States' Memorandum of Law in Opposition to Defendant Carmine Avellino's

Motion to Withdraw his Guilty Plea, dated Nov. 13, 1996, at 15), and the court plainly believed that it had all of the State evidence before it, *see* Order at 3 n. 1 ("the parties have submitted extensive papers, including the undisclosed evidence...."). The record does not reveal that defense counsel challenged the completeness of the production made in the wake of the motion, except to rain rhetoric on the court as to the knowledge and lack of diligence of the Eastern District AUSAs, and to ask, "what else has been kept from the defense?" (Affirmation of Jay Goldberg dated December 5, 1996, at 9.)

In the absence of a proffer by Avellino of any nonspeculative basis for inferring that, in response to the plea withdrawal motion, the government had not made available to him all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary.

### C. *The Role of Prejudice to the Government*

■ Finally, we think it advisable to say a word about what standards govern the decision of a motion to withdraw a plea of guilty where the ground for the motion is that the government violated the defendant's rights under *Brady*. As a general matter, a defendant has no absolute right to withdraw his plea of guilty. *See, e.g., United States v. Williams*, 23 F.3d 629, 634 (2d Cir.), *cert. denied*, 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 547 (1994); *United States v. Rodriguez*, 968 F.2d 130, 140 (2d Cir.), *cert. denied*, 506 U.S. 847, 113 S.Ct. 139, 121 L.Ed.2d 92 (1992). The Federal Rules of Criminal Procedure provide that where a motion to withdraw the plea is made prior to sentencing, the district court "may" grant it for any reason that is "fair and just." Fed.R.Crim.P. 32(e); *see United States v. Williams*, 23 F.3d at 634; *United States v. Vega*, 11 F.3d 309, 313 (2d Cir.1993); *see also Kercheval v. United States*, 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927) ("The court in exercise of its discretion will permit one accused to substitute a plea of not guilty and have a trial if for any reason the granting of the privilege seems fair and just."). Within this general framework, a defendant seeking to withdraw his plea normally bears the burden of demonstrating both "that there are valid grounds for withdrawal and that such

grounds are not outweighed by any prejudice to the government." *United States v. Vega*, 11 F.3d at 313; *see also* Fed.R.Crim.P. 32 Advisory Committee Note (1983) ("If the defendant has established such a reason, it is then appropriate to consider whether the government would be prejudiced by withdrawal of the plea.").

The district court adverted to these general principles in denying Avellino's motion in the present case. It denied the motion on the grounds (1) that there was no valid basis for withdrawal of the plea because the undisclosed evidence was not material and hence there was no *Brady* violation; and (2) that if the plea were withdrawn, there would be a likelihood of significant prejudice to the government. In our view, however, where the motion is based solely on an alleged *Brady* violation, the general Rule 32(e) framework is not controlling.

■ The term "any fair and just reason" in Rule 32(e) obviously encompasses denials of due process and other constitutional defects; but it also includes grounds that are not of constitutional dimension. The fair-and-just-reason standard is thus "more generous" to the defendant than are standards that require establishment of " 'a fundamental defect which inherently results in a complete miscarriage of justice' or 'an omission inconsistent with the rudimentary demands of fair procedure.' " Fed.R.Crim.P. 32 Advisory Committee Note (1983) (quoting *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962) (setting standard for claims pursued under 28 U.S.C. § 2255)). Rule 32 plainly gives the court discretion with respect to a motion that is based on grounds of nonconstitutional dimension, and if such grounds are found to be established, the Rule is meant to require consideration of the potential for prejudice to the government if the plea were to be withdrawn. However, where a *Brady* violation is established, that is, the court has found that the government withheld favorable information from the defendant and has ruled that there is a reasonable probability that the information, if disclosed, would have led the defendant not to plead guilty, we are unaware of any authority for the proposition

that the court has discretion to deny the motion. Rather, "if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury,'" a "new trial is required." *Giglio v. United States*, 405 U.S. at 153–54, 92 S.Ct. at 765–66 (quoting *Napue v. Illinois*, 360 U.S. at 269, 271, 79 S.Ct. at 1177–78). *See also Kyles v. Whitley*, 514 U.S. at 435, 115 S.Ct. at 1566 (a *Brady* violation, given the nature of the test for materiality, cannot be harmless). And in the context of a proven *Brady* violation, we would think it entirely inappropriate to allow the government to defeat the motion by arguing that the warranted remedy for its own constitutional violation is likely to cause it prejudice.

In the present case, the district court's reference to the likely prejudice to be suffered by the government in the event of a plea withdrawal was, of course, harmless, since there was no *Brady* violation. We express no view as to how Rule 32 is to be applied with respect to claims of constitutional violations other than *Brady* violations.

### CONCLUSION

We have considered all of Avellino's contentions on this appeal, and have found in them no basis for reversal. The judgment of the district court is affirmed.

### PETITION FOR REHEARING

#### April 23, 1998

Petition for rehearing of opinion filed January 30, 1998. Petition denied.

*Per Curiam:*

Although the government prevailed on appeal in this case, it has filed a petition for rehearing because it believes "language in the Court's opinion goes beyond what is necessary to resolve the case and seemingly imposes far-reaching new constitutional obligations on the government." (Government Petition for Rehearing at 2.) In moving for rehearing, the government argues for the first time that it has no obligation to produce *Brady* or *Giglio* material prior to the entry of a guilty plea.

While we emphasize that our opinion does not impose new constitutional obligations of any sort, we deny the government's petition. First, the argument was not previously presented to this Court. Rather, the government's brief on appeal acknowledged that a prosecutor's duty to disclose encompasses both exculpatory evidence as well as evidence that may be used to impeach a witness, and that the duty to disclose applies "[i]n the context of a guilty plea." (Government brief on appeal at 25 (citing *Tate v. Wood*, 963 F.2d 20, 25 (2d Cir.1992); *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir.), *cert. denied*, 488 U.S. 890, 109 S.Ct. 224, 102 L.Ed.2d 214 (1998)).)

Second, the argument goes too far. Although, as the government argues, guilty pleas are entered in many cases even before discovery is produced, in some cases a guilty plea is not entered until after the government's duty to disclose arises. In this case, for example, the district court ordered the government to produce certain *Giglio* materials in advance of trial. Hence, the government had a duty to disclose the impeachment evidence and it was obliged to do so. When the government is obliged to produce *Giglio* materials, its failure to do so may be a basis for vacating the guilty plea if the withheld evidence was "material."

We express no view regarding when the government's obligation to disclose *Giglio* material might arise in other cases. In this case we affirmed the district court's decision not to vacate the guilty plea because the undisclosed impeachment evidence was not "material." The issue of the timing of the government's obligation to disclose the impeachment materials was not before us. We did not purport to change existing law as to *when* the government must disclose *Brady* and *Giglio* materials, and the government remains free to address the timing issue in a future case in which it fails to disclose evidence that is material in the *Brady* sense.

The petition for rehearing is denied.