*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

UNPUBLISHED
September 21, 2023

v

No. 364083
Oakland Circuit Court
LC No. 2019-272265-FC

FLOYD RUSSELL GALLOWAY, JR.,

        Defendant-Appellee.

Before: GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

In this interlocutory appeal, the prosecution appeals by leave granted[1] an order suppressing evidence derived from a tip that was communicated to the Farmington Hills Police Department in violation of defendant's attorney-client privilege and right to due process. We affirm.

Defendant is charged with first-degree premeditated murder of Danielle Stislicki. Stislicki was last seen on December 2, 2016, leaving her workplace with defendant, a former security guard for the building, in the passenger seat of her vehicle. Stislicki did not attend a previously scheduled engagement that evening and has not been heard from since. Stislicki's parents reported her missing after they discovered her vehicle at her apartment parked in its normal spot the next day, along with her purse, identification, and credit cards.

Gary Mayer was the chief of police for the Troy Police Department at all times relevant to this case. On the evening of December 9, 2016, Mayer received a phone call from his long-time friend Jim Hoppe. Hoppe, a former FBI agent, said he had information about a security guard and a homicide, but could not share it unless his identity was kept confidential. Because of the substantial media attention surrounding Stislicki's disappearance, Mayer understood which case Hoppe was referring to. Mayer agreed to do his best to maintain Hoppe's confidentiality. Although Hoppe did not explain how he acquired the information at the time of this phone call,

---

[1] *People v Galloway*, unpublished order of the Court of Appeals, entered February 9, 2023 (Docket No. 364083).

Mayer assumed Hoppe was sharing information Hoppe learned in his role as a polygraph operator for defense attorneys. After ending his call with Hoppe, Mayer contacted the Farmington Hills Police Department (FHPD) and relayed Hoppe's information to FHPD chief of police Charles Nebus. Mayer insisted that his source could not be identified and did not share anything about the source with Nebus.

Without identifying Mayer's role in relaying the tip, Nebus recorded the following information on a tip sheet:

> A caller said the security guard did it. He drove the victims [sic] car from his house in Berkley to her apt., then walked to Tim Horton's at 10 and Halsted where he called Shamrock cab or something that sounds like Shamrock where he received a cab ride to within walking distance from his work where his car was parked. There should be evidence on or in the victims [sic] car. The subject threw the victims [sic] keys in a grassy area by the freeway while walking to Tim Horton's. The fitbit should be near the keys. The victims [sic] cell phone was placed in the trash inside Tim Horton's. The victims [sic] body should be inside a beige and brown comforter. Upon further questioning, the caller had no further information and wished to remain anonymous.

FHPD personnel investigated the tip that very evening and recovered Stislicki's keys and Fitbit, as well as surveillance footage of defendant's movements on the night of Stislicki's disappearance.

The lengthy evidentiary hearing focused primarily on what various officers and prosecutors knew regarding the source of the tip at any given time throughout the investigation. Although the Oakland County Prosecutor's office became aware that the tip likely came from a privileged source as early as January or February 2017, no steps were taken to mitigate the breach of attorney-client privilege, nor did the FHPD attempt to identify Mayer's source. The issue was all but ignored until the Attorney General took over the case in early 2019. Special assistant attorney general Jaimie Powell Horowitz recognized that the identity of the tipster would present a problem for the prosecution and began to question Mayer about the tipster. When Mayer continued to refuse to name his source, Powell Horowitz initiated investigative subpoena proceedings and obtained an order compelling Mayer to reveal his source. Mayer was left with no choice but to name Hoppe and acknowledge that Hoppe was a polygraph operator for the attorney representing defendant in a separate matter.

The trial court determined that the government violated defendant's right to due process and that suppression of the evidence derived from the tip was necessary. It reasoned that Mayer was objectively aware of an attorney-client relationship, and Nebus was aware or should have been aware based on the totality of the circumstances. It also found that the government intentionally intruded into the privileged relationship by using the information shared by Hoppe to further its investigation, and that this intrusion caused defendant actual and substantial prejudice. The prosecution now challenges the trial court's decision to suppress the evidence.

We review de novo both a trial court's suppression of evidence and underlying questions of constitutional law. *People v Moorman*, 331 Mich App 481, 484-485; 952 NW2d 597 (2020).

The trial court's factual findings are reviewed for clear error, which exists if this court is left with a definite and firm conviction that the trial court made a mistake. *Id*. at 485.

This Court recently had cause in *People v Joly*, 336 Mich App 388; 970 NW2d 426 (2021), to consider the appropriate legal framework for determining whether breach of a defendant's attorney-client privilege rises to the level of violating due process. *Joly* acknowledged that the attorney-client privilege is firmly established in both common law and legislation, but is not a constitutional right. *Id*. at 397-399. Even so, caselaw across the country has long recognized that an egregious violation of the attorney-client privilege might be part of a broader claim that the government has violated a defendant's due process rights. *Id*. at 399-400. To determine if a breach of the attorney-client privilege rises to that level, *Joly* adopted the reasoning in *United States v Voigt*, 89 F3d 1050 (CA 3, 1996), which held that "only a finding of 'outrageousness' would warrant exclusion of evidence for a violation of due process." *Joly*, 336 Mich App at 401, 404. To establish outrageousness, the defendant must prove " '(1) the government's objective awareness of an ongoing, personal attorney-client relationship between [the attorney] and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice.' " *Id*. at 401, quoting *Voigt*, 89 F3d at 1067 (alteration in original). In reviewing this issue, this Court must exercise appropriate judicial restraint before reaching the extraordinary conclusion that the government action at issue was so offensive that it violated the defendant's constitutional right to due process. *Joly*, 336 Mich App at 404. See also *Voigt*, 89 F3d at 1065 (observing that due-process claims premised on outrageous investigative techniques are only viable in the most extreme cases).

Concerning the first prong of the *Voigt* test, the prosecution maintains that none of the FHPD officers involved in the investigation had actual knowledge or reason to believe that the tip originated from a privileged source at the time they acted on the information and discovered incriminating evidence. In support of this position, the prosecution argues that Mayer's actions cannot be attributed to the government because he took no part in the investigation—he was distinct from the investigating agency and, according to the prosecution, none of his actions regarding the tip differed from what a private citizen could have done in the same circumstances. Like the trial court, we reject the prosecution's attempt to exclude Mayer's actions from our due-process analysis.

Regardless of the fact that Mayer was not affiliated with the FHPD, we must consider the totality of the circumstances and, thus, cannot simply ignore the fact that Mayer was a high-ranking law-enforcement officer with many decades of experience and at least some knowledge of attorney-client privilege. See *Joly*, 336 Mich App at 399 (noting that courts look to the totality of the circumstances in analyzing whether failure to observe fundamental fairness amounts to violation of due process). Mayer testified that he understood that communications between an attorney and client could not be shared and that the privilege extended to professionals employed by the attorney. Thus, assuming Mayer recognized that Hoppe acquired the information in the course of his work as a private polygraph operator for the defense, Mayer would be aware that use of Hoppe's tip in the investigation would unlawfully breach defendant's attorney-client privilege. Such knowledge clearly distinguishes Mayer from the average citizen who might unwittingly share privileged information.

Moreover, we infer that the nature of Mayer's employment was a key factor in Hoppe's decision to entrust Mayer with the privileged information. Mayer testified that Hoppe was clearly emotional and conflicted about his disclosure, but felt the need to share the information because of an expected snowstorm. The only rational conclusion that can be drawn from these facts is that Hoppe was not telling Mayer what he learned during defendant's polygraph examination because of their longstanding friendship, but because Mayer was in a position to do something to preserve important evidence from getting lost or destroyed from the snow. This again distinguishes Mayer from the average citizen.

While we recognize that Mayer had no formal affiliation with the investigation, the prosecution's reliance on caselaw rejecting *Brady*[2] claims premised on evidence possessed by "uninvolved" government agencies is simply unavailing. The prosecution directs this Court's attention to *United States v Avellino*, 136 F3d 249, 255 (CA 2, 1998), wherein the federal court reasoned that

> knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis. [Quotation marks and citation omitted.]

This passage makes clear why the same reasoning cannot be applied here. This is not a case in which the FHPD is being charged with knowledge or misconduct of a person without any known connection to the investigation—the very problem is that Mayer *was* involved in the investigation. He intentionally interjected himself into the matter when he conveyed Hoppe's tip to the FHPD. Mayer's involvement was certainly not a mystery to Nebus, the chief of the investigating agency and recipient of the second-hand tip, at any time.

The trial court did not clearly err by finding that Mayer had objective awareness of an ongoing attorney-client relationship. When he received the call from Hoppe, Mayer knew that Hoppe worked as a polygraph operator. Although Mayer initially testified that he was unsure whether Hoppe had already retired from the FBI at the time of the call, he later conceded that he knew Hoppe was then working for defense attorneys. It is immaterial that Hoppe did not expressly tell Mayer how he acquired the information, because the objective nature of the first *Voigt* prong does not require actual knowledge. See *Voigt*, 89 F3d at 1069 (reasoning that the due process claim failed when record was devoid of evidence that the government "was or *should have been* aware of a personal attorney-client relationship") (emphasis added). See also *Prentis Family Foundation v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 47-48; 698 NW2d 900 (2005) (explaining that objective knowledge standard is implicated by "knew or should have known" language). Coupled with Hoppe's unexplained insistence on confidentiality, Mayer clearly should have known that Hoppe was sharing information he learned while acting as an agent

---

[2] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

of defense counsel. Mayer, at minimum, had objective awareness of the attorney-client relationship all along.

On the other hand, the trial court's determination that Nebus likewise had objective awareness is more tenuous. The trial court's finding regarding Nebus was premised on four factors: (1) Nebus recognized that Mayer's call regarding the "confidential" tip was unusual and urgent; (2) Nebus did not follow standard protocol for preserving the information when he excluded Mayer's name from the tip sheet and simply labeled the tip as anonymous; (3) Nebus later sought legal counsel regarding the tip; (4) and Nebus felt pressure to disclose Mayer's involvement to the Oakland County Prosecutor's office, thereby demonstrating "he knew what he was doing was wrong."

Confidential tips are not unusual in criminal investigations, and the government is often permitted to conceal the identity of confidential informants. See *People v James*, 327 Mich App 79, 90-91; 932 NW2d 248 (2019) (discussing that probable cause may be based, in part, on information from a confidential informant); *People v Henry (After Remand)*, 305 Mich App 127, 156; 854 NW2d 114 (2014) (stating that the government is not obligated to identify confidential informants). There are any number of reasons a tipster might wish to remain unknown. To name but a few, the tipster might fear retribution, feel a degree of guilt about implicating a loved one, believe he or she might be implicated in the crime, or wish to avoid being labeled a "snitch." Without knowledge that the source was a private polygraph operator, the request for anonymity was not inherently suggestive of an ongoing attorney-client relationship or other form of privilege. In our view, the facts cited by the trial court imply only that Nebus suspected the tip was privileged. But there is a significant distance between mere suspicion that there was something suspicious about the tip and objective awareness that the tipster was an agent of defense counsel. Nonetheless, the trial court did not err with respect to its analysis of Mayer's knowledge, and that was sufficient to establish the first prong of the *Voigt* test.

The next prong of the *Voigt* test requires deliberate intrusion into the attorney-client relationship. *Joly*, 336 Mich App at 401. We agree with the trial court that the record demonstrates such deliberate intrusion. As to this issue, the underlying circumstances are analogous to *Joly*. In that case, the Jackson Police Department was investigating a suspected arson after the defendant's home was intentionally set on fire. *Id*. at 392. The defendant retained the Abood Law Firm as defense counsel, and the firm proactively advised the prosecutor's office of its representation before charges were filed. *Id*. When defendant's tablet computer was inspected by the Michigan State Police (MSP) forensic laboratory, a technician discovered an e-mail between the defendant and an employee of the Abood Law Firm in which the people to whom the defendant had given incriminating evidence were identified. *Id*. at 393. Although the e-mail, on its face, appeared to be protected by attorney-client privilege, the technician provided it to the investigating detective, who then interviewed the people named in the e-mail and recovered the incriminating evidence. *Id*. Relative to second part of the *Voigt* test, this Court explained:

> [I]t was not the apparent *inadvertent* discovery of the privileged e-mail that is particularly troublesome here, but rather what happened after the discovery. After learning of the privileged e-mail, the detective did not attempt to segregate the e-mail, turn the case over to another detective or a different law-enforcement office, seek guidance from the court officer who signed the warrant, or work with the

prosecutor to develop some other measure to separate the investigation from the privileged information that the detective learned from reading the e-mail (and could not realistically unlearn). Instead, the detective doubled down on the breach and used the privileged information to further his investigation of defendant. And the information in the e-mail was not incidental or only marginally material, but instead provided the key information—the location—that the detective did not previously have about the lawnmower and gas can. There was, in other words, a direct link between the detective's reading of the e-mail and his retrieval of both pieces of evidence. This can only be characterized as a deliberate intrusion into the substance of the attorney-client relationship. [*Id*. at 405-406.]

The same troubling response occurred in this case. Despite objective awareness that Hoppe's tip was protected by attorney-client privilege, Mayer immediately turned the privileged information over to the investigating agency with the expectation that the FHPD would investigate the tip and recover important evidence before it could be lost or destroyed by inclement weather. This is precisely what occurred; Nebus rallied his troops, the locations identified in the tip were searched, the FHPD found Stislicki's keys and Fitbit, and evidence regarding defendant's movements on the night of her disappearance was discovered. Like in *Joly*, this can "only be characterized as deliberate intrusion into the substance of the attorney-client relationship." *Id*. at 406.

The prosecution emphasizes that the FHPD had no reason to believe the tip was privileged when it followed-up on the information and again urges this Court not to impute Mayer's knowledge or conduct to the FHPD. But Mayer's involvement is the precise problem in this case. *Joly* theorized that a government actor who comes across privileged information should take mitigating steps like segregation of the information, transferring the case to a different investigator or office, or seeking guidance from a court officer or prosecutor. *Id*. at 405. Here, Mayer would not need to take such measures to avoid deliberate intrusion into defendant's attorney-client relationship. Had he simply held his silence, the FHPD's investigation would have continued in its normal course, free of any taint from Hoppe's disclosure of privileged information. But like the detective in *Joly*, Mayer did the exact opposite and instead perpetuated the breach of privilege. Mayer gave the information to the FHPD to further its investigation in disregard of defendant's rights. Regardless of the fact that Mayer's own police department was otherwise uninvolved in the investigation, the plain reality is that a government actor recognized a breach of the attorney-client privilege and then took intentional steps to exploit it and thereby obtain incriminating evidence.

Although the prosecution does not challenge the trial court's finding regarding the final part of the *Voigt* test, it is readily apparent that the trial court did not err by concluding that the government misconduct resulted in actual and substantial prejudice to defendant. See *id*. at 401. While it is true that defendant was already suspected in Stislicki's disappearance before the tip came in on December 9, 2016, that was principally because he was the last person seen with her, there was evidence suggesting that she was in his home, and defendant appeared nervous and lied about his whereabouts when he was questioned. *People v Galloway*, 335 Mich App 629, 634; 967

NW2d 908 (2020).[3]  Investigation of the privileged tip led to discovery of critical evidence that defendant tried to dispose of Stislicki's belongings shortly after she was last seen and conceal doing so, greatly strengthening the case against him.  The tip and derivative evidence was also incorporated in numerous search warrant affidavits, raising further questions about the extent of the taint in this case.  Again, in line with *Joly*, the third element is easily satisfied here.  *Joly*, 336 Mich App at 406.  Because each prong of the *Voigt* test is satisfied, defendant demonstrated outrageous government conduct that violated his right to due process.  See *id*. at 399-401.

Having found a violation of due process, the question of the appropriate remedy remains.  See *id*. at 400.  "When the violation occurs in the context of gathering pretrial evidence, courts have developed a remedy referred to as the 'exclusionary rule.' "  *Id*.  Under the exclusionary rule, "evidence that was obtained as a result of a fundamentally unfair investigatory process" is inadmissible at trial.  *Id*.  As the *Joly* Court noted, the exclusionary rule is designed to "compel respect for constitutional rights, deter violations of those rights, and preserve judicial integrity." *Id*.

The prosecution argues that suppression of evidence was not an appropriate remedy in this instance because the FHPD acted in good faith reliance on the tip, such that application of the exclusionary rule would not advance its most critical purpose—deterrence of police misconduct. As defendant correctly points out, the good-faith exception to the exclusionary rule has been developed almost exclusively in the Fourth Amendment context concerning unreasonable searches and seizures, making its application in this context uncertain.  The limited scope of the exception is underscored by the fact that only one of the many authorities cited by the prosecution regarding good-faith police activities addresses a legal issue distinct from Fourth Amendment principles.

That single case is *Michigan v Tucker*, 417 US 433; 94 S Ct 2357; 41 L Ed 2d 182 (1974), in which the Supreme Court considered whether the defendant was entitled to exclusion of a witness identified in the course of an interrogation that did not violate the defendant's Fifth Amendment right against compelled self-incrimination, but failed to fully satisfy the procedural safeguards designed to safeguard that right.  At the outset of its analysis, the Supreme Court prudently observed:

> Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policeman [sic] investigating serious crimes make no errors whatsoever.  The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic.  Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose.  [*Id*. at 446.]

---

[3] This was a previous appeal in this case regarding whether the prosecution could introduce evidence of defendant's prior conviction to prove motive, identity, or a common plan.  This Court held that defendant's prior conviction could not be introduced because it was too dissimilar to the instant charge and thus would constitute inadmissible character evidence.

The Court noted that its search-and-seizure precedent made clear that deterrence of police misconduct was the primary purpose of the exclusionary rule. *Id.* In other words, the exclusionary rule does not try to compensate a defendant whose rights have been violated, but rather to prevent police misconduct in the first instance by removing the incentive to resort to unlawful methods. *Id.* The Court then continued:

> By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force. [*Id.* at 447.]

The Supreme Court ultimately determined that the witness the defendant identified during his interrogation should not be excluded from trial because the police acted in accordance with then-existing precedent when they questioned the defendant. *Id.* The Court also reasoned that the exclusionary rule was alternatively justified in the context of certain Fifth Amendment violations because the Self-Incrimination Clause endeavors to avoid convictions on the basis of evidence that is coerced and, therefore, inherently untrustworthy. *Id.* at 448-449. Yet the defendant in *Tucker* was not exposed to coercive pressures, nor did he make an unreliable confession. *Id.* at 448-449. Because none of the goals of the exclusionary rule would be advanced in *Tucker*, there was simply no reason to apply it.

The reasoning in *Tucker* is persuasive in this context as well, though not in the prosecution's favor. The prosecution again focuses too narrowly on what members of the FHPD knew at the time they acted on the tip. The deterrent purpose of the exclusionary rule is plainly implicated by willful police misconduct, and it is all but impossible to characterize Mayer's decisions in this case as anything but a knowing and intentional violation of defendant's attorney-client privilege. Allowing the evidence derived from Mayer's misconduct to be used at trial on the basis of the FHPD's "good faith" would completely undermine the exclusionary rule. Rather than deterring police misconduct, such a ruling could actually encourage misconduct where FHPD officers could use information obtained in violation of attorney-client privilege, as long as Mayer never revealed the source. We conclude that the trial court did not err by excluding the evidence derived from Mayer's disclosure of the privileged information.

That said, we agree with the prosecution that the trial court's ruling regarding the extent of evidence to be excluded was over expansive as it relates to two categories of evidence: Stislicki's cell phone and "forensic data retrieved therefrom." Concerning the first item, the error is harmless because there is no indication in the record that Stislicki's cell phone was ever located. The tip reported that the cell phone was discarded in a trash can at Tim Hortons, and the trash was apparently emptied before the police searched that location on December 9, 2016. Inasmuch as Stislicki's cell phone is not in the possession of the FHPD or prosecution, it could not be admitted in evidence in any event. As to the second item, the "forensic data" retrieved from Stislicki's cell phone, it is unclear what specific evidence the trial court was referring to. Because Stislicki's phone was never recovered, no data could be extracted directly from the device. But to the extent that the trial court's ruling incorporated Stislicki's cell phone records or the pen register from her account, those documents were procured by search warrants executed before the privileged information was shared with the FHPD and not as a product of outrageous government misconduct.

Such evidence should not be excluded on the basis of the due-process violation at issue in this appeal.  We therefore remand for the trial court to amend its opinion and order accordingly.  In all other respects, we affirm.  We do not retain jurisdiction.

Affirmed.

/s/ Michael F. Gadola
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly