John SMYLIS, Plaintiff,

v.

The CITY OF NEW YORK,
et al., Defendants.

No. 97 Civ. 4198(LAK).

United States District Court,
S.D. New York.

Dec. 3, 1998.

Joseph M. Librie, Lake Success, NY, for Plaintiff.

Elisa Baldwin, Assistant Corporation Counsel, Michael D. Hess, Corporation Counsel of the City of New York, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff John Smylis is an assistant deputy warden employed by the New York City Department of Corrections ("DOC"). He was disciplined upon his plea of guilty to departmental administrative charges in 1994 and subsequently brought this action against the City and others making a great variety of claims. The Court dismissed his initial complaint in *Smylis v. City of New York*[1] with leave to replead to assert claims that he was deprived of a property interest in violation of his right to due process of law by the alleged coercion of his guilty plea and that the same alleged conduct violated his rights under Section 75 of the New York Civil Service Law. Plaintiff duly amended to assert those claims. Discovery now is completed. The matter is before the Court on defendants' motion for summary judgment dismissing the complaint.

### Facts

There is no dispute as to any material facts as the defendants, for purposes of this motion, rely only on plaintiff's account of the events culminating in his guilty plea.

In June 1994, plaintiff was an assistant deputy warden assigned to the Bronx House of Detention for Men. On June 7, two incidents occurred at that facility involving the use of force against inmates.[2]

### The June 14 Meeting

On June 14, plaintiff was instructed to appear at the DOC office at 60 Hudson Street in Manhattan at 2 p.m. rather than reporting for work at the Bronx House of Detention. He arrived in the company of his attorney, Phillip Caraczyk, and his union representative, Tommy O'Shea.[3] Laura Higby, the DOC Department Advocate, ushered the trio into a room in which two other DOC officials were present.[4]

Ms. Rigby began the meeting by informing plaintiff that he would not be asked any questions that day, that he was there to listen to what she had to say, and that he should listen carefully because he was in serious trouble.[5] She said that plaintiff in her view was a criminal and that she would do everything in her power to have him arrested and indicted.[6]

Ms. Rigby then accused plaintiff of acting in collusion with other DOC employees to beat the inmates involved in the June 7 incidents, of supplying contraband to the Inspector General after the incident, and of acting in collusion with other staff members to feign injury to an officer who claimed to have been slashed.[7] She told plaintiff that she had a videotape, which she refused to show him, that showed plaintiff laughing or smiling as he watched an inmate being beaten.[8]

Plaintiff contends that this presentation by Ms. Rigby went on for what "felt like an hour" during which he believed "that the door was going to open up . . . and they were coming in and putting the cuffs on."[9] At the conclusion of Ms. Rigby's remarks, she allegedly told plaintiff not to make any plans, that he was not going back to work, and that he was to report to the same office on the following day.[10]

Following the meeting, plaintiff discussed the meeting with his lawyer and his union representative.[11] The record, however, does not disclose the substance of their discussion beyond indicating that the three felt that plaintiff had been treated harshly and unprofessionally and that plaintiff would have a chance to present his case.[12]

---

1. 983 F.Supp. 478 (S.D.N.Y.1997).

2. *See generally* Cpt ¶¶ 11–29.

3. Smylis Dep. 55–56.

4. *Id.* 60–61.

5. *Id.* 61–62.

6. *Id.* 62.

7. *Id.*

8. *Id.* 62–63.

9. *Id.* 63, 65.

10. *Id.* 64, 66.

11. *Id.* 65.

12. *Id.* 66–68.

*The June 15 Meeting*

Plaintiff, Caraczyk, and O'Shea returned to the DOC office on the following day. Ms. Rigby again met them and told O'Shea that he could not be present, following which he waited in a separate room while plaintiff and his attorney met with Rigby.[13]

Rigby began this meeting by recapitulating her remarks of June 14, but "there was a change in her presentation."[14] She told plaintiff that things would be "very different" for him if he would testify against officers or captains who had engaged in wrongdoing, indicating that she sought testimony against individuals named Morrisey and Perez.[15] Plaintiff responded that it would be difficult for him to remain at DOC if he testified against co-workers and that whatever information he had would not be helpful to Rigby.[16]

The meeting went on for about two hours during which there was general discussion in which plaintiff sought to explain that what had occurred on the date in question was "not out of the ordinary."[17] But Rigby said that she did not believe plaintiff and asserted that plaintiff was "in cahoots with Morrisey and Perez," who in her view were leaders in feigning the slashing and in planting evidence on and beating inmates.[18] Plaintiff responded that he did not believe that that was true.[19] At one point, Rigby asked if plaintiff was eligible to retire and suggested that she would let him vest if he helped her out.[20]

At some point toward the end of the meeting, the atmosphere "changed dramatically."[21] Rigby continued to express her dissatisfaction, but she and Caraczyk began discussing a negotiated plea.[22] She indicated that the matter might be brought to a conclusion if plaintiff would agree to some sort of a disciplinary charge, implying that criminal charges would be pursued if he did not do so.[23] She asked plaintiff to agree to a thirty day suspension and a transfer.[24]

Plaintiff and Caraczyk then took a break and went outside to discuss the situation.[25] They returned and made a counterproposal of twenty days vacation time.[26] Rigby agreed.[27] So when plaintiff and his lawyer left the meeting, they thought they had an agreement on twenty vacation days and no transfer.[28]

*The June 16 Meeting and the Plea Agreement*

Plaintiff and Caraczyk returned on the following day to meet with Rigby and sign the papers.[29] Rigby, however, said that the original deal was not workable. She insisted that plaintiff agree to a twenty day suspension, that he take his vacation time concurrent with the suspension, that plaintiff be transferred to another facility in the Bronx, and that plaintiff agree not to speak to other DOC employees during the pendency of Rigby's vacation.[30]

Plaintiff and Caraczyk then met privately to discuss whether to agree to Rigby's terms.[31] Caraczyk advised plaintiff that he did not have to sign the plea agreement but

13. *Id.* 69.

14. *Id.* 70.

15. *Id.*

16. *Id.* 71.

17. *Id.* 72–73.

18. *Id.* 71–73.

19. *Id.*

20. *Id.*

21. *Id.* 73.

22. *Id.* 74.

23. *Id.* 71–74.

24. *Id.* 73, 77.

25. *Id.* 77–78.

26. *Id.*

27. *Id.* 77.

28. *Id.* 78.

29. *Id.* 78–79.

30. *Id.* 79–80.

31. *Id.* 80–81.

could contest the charges and go "to oath"[32]—a reference to DOC's Office of Administrative Trials and Hearings—and also that if plaintiff signed the agreement and later were sued, the City would not have to represent him in the civil suit.[33] Plaintiff considered also the possibility that Rigby might pursue criminal charges.[34] In the last analysis, plaintiff "tried to make the best deal that [he] could," returned to the meeting room and "agreed reluctantly" to Rigby's terms.[35] He thereupon signed an agreement consenting to a twenty day suspension, six months probation with respect to a violation of the DOC directive concerning use of force, and retraining in supervisory use of force techniques and procedures.[36] The written agreement recited plaintiff's awareness of his right to a disciplinary hearing at which he would be entitled to legal representation, to confront the witnesses against him, and to present witnesses on his own behalf but expressly waived those rights.[37] He agreed orally to accept a transfer to another facility in the Bronx,[38] and Rigby agreed that plaintiff would not be called upon to testify against co-workers.[39]

### Plaintiff's State of Mind

Plaintiff's deposition, which is the only evidence on the point, contains a few passages indicative of plaintiff's state of mind during the events at issue. He said that he was "dumbfounded" by the situation in which he found himself on the 14th and then feared that he might be arrested,[40] was very disturbed at the manner in which he was treated and felt "humiliated," "stunned, shocked"

and "threatened" by Rigby's actions that day.[41] On the 15th he had "the strong feeling that [Rigby] was going to lock [him] up or have [him] indicted."[42] He was concerned also because he was going through a divorce and a contested custody matter and was scared that he could not support his family if he were indicted.[43] He claimed also that he was being bullied.[44]

### Discussion

■ Section 75 of the New York Civil Service Law provides in relevant part that a person subject to its protections, which concededly includes the plaintiff, "shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section."[45] The suspension to which plaintiff was subjected was a penalty provided in Section 75.[46] The Court therefore assumes that plaintiff had a constitutionally protected interest at least in the compensation of which the suspension deprived him and that he could not be deprived of that interest absent notice and a hearing.[47] As plaintiff's plea bargain ostensibly waived that right, the only question for decision is whether that waiver satisfied constitutional requirements.

The first issue is the standard by which this issue is to be determined, but the matter need not detain the Court long. Plaintiff's plea bargain here, although civil and administrative in nature, was no different in princi-

32. *Id.* 81.

33. *Id.* at 82.

34. *Id.*

35. *Id.* 80, 81–82.

36. *Id.* 84–85. *Accord*, Marino Decl.Ex. 2.

37. Marino Decl.Exs. 2–3.

38. Smylis Dep. 86.

39. *Id.* 97.

40. *Id.* 63.

41. *Id.* 64, 66, 67.

42. *Id.* 74.

43. *Id.* 74–76.

44. *Id.* 81.

45. N.Y.Civ.Serv L. § 75, subd. 1 (McKinney 1988 Supp.).

46. *Id.* § 75, subd. 3.

47. *But cf. Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 1811, 138 L.Ed.2d 120 (1997) (expressing doubt as to whether discipline of tenured public employees short of termination is subject to due process protections).

ple than a plea bargain in a criminal case.[48] In each situation, the accused is confronted with an actual or potential prosecution. In each, the accused gives up the right to a trial and other procedural protections, admits guilt, and accepts a punishment or range of punishment known in advance in exchange for eliminating the risk of more serious consequences in the event the accused is found guilty after trial. As the interests at stake in criminal cases are substantially more serious than here, involving liberty and on occasion even life itself, a waiver or plea that would withstand attack in a criminal case *a fortiori* must withstand attack here. Hence, it is unnecessary to consider whether some lesser standard would apply in this case if plaintiff's plea, were it offered in a criminal case, would withstand attack.

▉ The Supreme Court has made it abundantly clear "that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked."[49] "It is also well settled that plea agreements are consistent with the requirements of voluntariness and intelligence—because each side may obtain advantages when a guilty plea is exchanged for sentencing concessions, the agreement is no less voluntary than any other bargained-for exchange."[50] Hence,

> "a plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own

counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g.bribes)."[51]

Moreover, voluntariness is not so much a quest for a defendant's subjective state of mind as an inquiry into whether the defendant was assisted effectively by counsel[52] and understood the law in relation to the facts.[53] While impermissible government conduct such as the failure to disclose exculpatory evidence,[54] physical violence or threats thereof,[55] or "mental coercion overbearing the will of the defendant"[56] may vitiate a plea, an offer by a prosecutor to accept a plea to a lesser offense or to accept a lower punishment in exchange for a guilty plea simply does not offend the Constitution. As the Supreme Court said in *Brady*, "we cannot hold that it is unconstitutional for the State to extend a benefit to a defendant who in turn extends a substantial benefit to the State and who demonstrates by his plea that he is ready and willing to admit his crime ..."[57] Indeed, in *Bordenkircher v. Hayes*,[58] the Court wrote, in words equally applicable here:

> "[A]cceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply

---

48. *Hodgson v. Lodge 851, Int. Ass'n of Mach. & Aerospace Wkrs.*, 454 F.2d 545 (7th Cir.1971), held that a union's waiver of the time period in which the Secretary of Labor could bring a civil action against it was not involuntary when faced with the choice of "sign or be sued." *Id.* at 553. The court reasoned that "waivers of constitutional rights have been deemed voluntary in far more coercive situations." *Id.* (citing *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (criminal plea bargain context)).

49. *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) (footnote omitted) (collecting cases).

50. *Id.* (footnote omitted).

51. *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (internal quotation omitted).

52. *See United States v. Broce*, 488 U.S. 563, 573–74, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989).

53. *See McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); *Salas v. United States*, 139 F.3d 322, 324 (2d Cir.1998).

54. *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998).

55. *Brady*, 397 U.S. at 750, 90 S.Ct. 1463.

56. *Id.*

57. *Id.* at 753, 90 S.Ct. 1463.

58. 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of a greater penalty upon conviction after a trial." [citations omitted]

"While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'—and permissible—'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.' [citation omitted] It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty."[59]

In this case, the undisputed facts demonstrate that plaintiff's plea was voluntary and intelligent in every relevant sense. He was advised by counsel, and there is no suggestion that counsel's representation fell below constitutional standards of effectiveness. There was no violence or threat of violence. The DOC attorney did not improperly withhold exculpatory evidence or engage in other comparable misconduct.[60] There is no claim of misrepresentation apart from a conclusory assertion in plaintiff's memorandum, which is unsupported by his deposition, that Rigby misrepresented that plaintiff would be arrested and charged with crimes unless he pleaded.[61] There certainly is no assertion of any bribe or analogous misbehavior.

In the last analysis, then, plaintiff's claim of coercion comes down to the claims that (1) he was threatened with criminal prosecution, he was offered what by any objective standard was an extremely attractive civil alternative, and he took it rather than face the risk of criminal charges and possible loss of his job, and (2) Rigby "bullied" him and otherwise did not accord him the respect to which he thought himself entitled. But the first element upon which he relies is precisely the sort of bargained-for exchange that the Supreme Court has held "must stand." In fact, the Court in *Brady* rejected a contention that a plea agreed to in order to avoid the risk of a death sentence on conviction after trial was involuntary.[62] This case is *a fortiori* from that. And the second simply does not approach the level necessary to raise a genuine issue of fact as to whether plaintiff was subjected to mental coercion sufficient to overbear his will—particularly as he was represented throughout by counsel, caucused with counsel during the two pivotal meetings, left the DOC offices after each meeting, and engaged in what plaintiff himself characterized as plea negotiations,[63] however much his counsel now would like to pretend that what transpired was not a real or "meaningful" negotiation.[64]

Plaintiff seeks to distinguish the criminal plea bargaining cases on the ground that there here was no allocution before "a neutral magistrate, overseeing the propriety of the proceedings."[65] But plaintiff overlooks the fact that his due process claim depends upon whether the plea was coerced in a constitutional sense, not on whether a particular form of procedure was employed.[66] On

---

**59.** *Id.* at 363–64, 98 S.Ct. 663.

**60.** The refusal to permit plaintiff to view the videotape on demand was not a failure to disclose exculpatory evidence that counsel would have been obliged to turn over even if this were a criminal case. The videotape was of events in which the plaintiff participated and that he had supplied. Smylis Dep. 62–63. He therefore was aware of its contents and did not labor under any informational disadvantage in determining whether to plead.

**61.** Pl.Mem. 9.

**62.** 397 U.S. at 747, 90 S.Ct. 1463.

**63.** Smylis Dep. 73, 74, 78.

**64.** Pl.Mem. 9.

**65.** *Id.* 8.

**66.** Indeed, the allocution procedure set out in FED.R.CRIM.P. 11 is not constitutionally required and need not be followed by state courts. *See Gaddy v. Linahan*, 780 F.2d 935, 943 n. 8 (11th Cir.1986); *see also U.S. v. U.S. Currency in the Amount of $228,536*, 895 F.2d 908 n. 6 (2d Cir. 1990).

this point, the criminal cases are quite persuasive for the reasons set forth above.

### Conclusion

Given the Supreme Court's many holdings that bargained-for exchanges of the sort inherent in plaintiff's plea bargain are not involuntary and the fact that plaintiff's other complaints, even if assumed to be true, would not permit a trier of fact to conclude that plaintiff's plea bargain was coerced, defendant's motion for summary judgment dismissing the action is granted. The dismissal is on the merits as to the federal claim and for lack of subject matter jurisdiction as to plaintiff's claim that defendants failed to comply with the provisions of Section 75 of the New York Civil Service Law.

SO ORDERED.