UNITED STATES of America, Appellee,

v.

Lloyd WILLIAMS, Defendant–Appellant.

No. 193, Docket 93–1224.

United States Court of Appeals,
Second Circuit.

Argued Sept. 30, 1993.

Decided April 20, 1994.

Colleen Cassidy, The Legal Aid Soc., Federal Defender Services Appeals Unit, New York City, for appellant.

Patricia E. Notopoulos, Asst. U.S. Atty. for the E.D.N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty., David C. James, Asst. U.S. Atty. for the E.D.N.Y., Brooklyn, NY, of counsel), for appellee.

Before: LUMBARD, CARDAMONE, and LAY,* Circuit Judges.

CARDAMONE, Circuit Judge:

Among the issues before us on this appeal is whether the Federal Magistrates Act and the Constitution bar a magistrate judge from administering an allocution to a defendant entering a guilty plea to a felony. Congress has greatly multiplied the number of magistrate judges in recent years. Its purpose was not to create more judicial officers so that they could simply stand by and wait, but so that they could be a very present help to district courts, the dockets of which are awash in a sea of cases, and which therefore have the utmost need of magistrate judges' aid.

On February 14, 1992 Lloyd Williams entered a guilty plea pursuant to Fed.

R.Crim.P. 11 to the charge of conspiracy to import heroin. Prior to an allocution before Magistrate Judge Azrack, Williams signed a form consenting to the magistrate judge taking his plea. On appeal, his principal contention is that the magistrate judge lacked authority to accept his plea and that his conviction must therefore be vacated. Because we conclude this judicial officer had authority to accept Williams' guilty plea, we affirm.

## BACKGROUND

### A. The Importation Scheme

Lloyd Williams was arrested on October 24, 1991 after he took possession of two suitcases of heroin. The contraband had been imported into the United States by a courier or "mule" he had recruited. At the center of the importation scheme was Hajib.

Williams met Hajib in early 1989 while they were both inmates at the Ray Brook Correctional Facility, a medium security prison in the Adirondack Mountains of northern New York State. Discussions between the two men laid the foundation for the future drug importation scheme. Following Williams' release from prison in March 1990, he and Hajib agreed that Williams would recruit drug couriers in his hometown of Pittsburgh, Pennsylvania, in exchange for a share of the imported drugs. Although Hajib was still confined at Ray Brook, he planned, financed and orchestrated the entire operation.

In June 1990 Hajib arranged for Special Agent Anthony Longarzo of the Drug Enforcement Agency (DEA) to be informed that a courier carrying heroin would be arriving at John F. Kennedy Airport (JFK) in New York. Furnishing this piece of important information launched negotiations between Hajib and the government. While these discussions continued, Williams recruited his first courier for Hajib in October 1990. Hajib supplied the travel money and organized a drug delivery for a courier in Pakistan. When Hajib later realized that in the absence of a cooperation agreement with the govern-

---

* Hon. Donald P. Lay, Senior Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

ment he could be held criminally responsible for the importation of heroin from Pakistan, he attempted to stop the courier from returning to the United States. The supplier in Pakistan ignored his entreaties and simply diverted the courier to Michigan. For his efforts in recruiting the courier, Williams received a share of the narcotics.

A short time later the government and Hajib reached an understanding, as a result of which Hajib signed a cooperation agreement and began regularly providing the government with information. Based on information Hajib supplied, two couriers were arrested at JFK upon their arrival from Pakistan, one of whom revealed that she had been recruited by Williams. This prompted Agent Longarzo to inquire about Williams from Hajib. The latter agreed to arrange another importation in order to ensnare Williams; part of the plan envisioned Williams meeting Agent Longarzo, who would be posing as a heroin trafficker.

After several delays, the illegal importation scheme was set for October 1991. Williams recruited another drug courier, Geneva Massie, who was brought to New York by Williams' brother, Tyrone Williams. Massie flew to Pakistan where she picked up approximately 10 kilograms of heroin. Upon her return to JFK she was arrested by DEA agents. Meanwhile, Williams, his father-in-law, Paul Jackson, another conspirator named James Mahone and Agent Longarzo were waiting in a hotel room. After her arrest Massie was taken to the hotel room where Williams and the other participants were standing by. All were arrested. Shortly thereafter, Williams agreed to cooperate with the government as did Mahone and Massie. Having executed a written cooperation agreement, Williams indicated his willingness to plead guilty to conspiracy to import heroin. His brother and father-in-law both proceeded to trial and were convicted.

## B. *Prior Proceedings*

The district court, with Williams' consent, referred the guilty plea to a magistrate judge for the purposes of administering the allocution pursuant to Fed.R.Crim.P. 11, making a finding as to whether the plea was knowingly and voluntarily entered, and recommending to the district court whether the plea should be accepted. On February 14, 1992 Williams signed a written consent form for the referral of the plea to the magistrate judge. The magistrate questioned him to ensure that he knew he had the right to have his plea taken by the district court. After Williams stated that he understood he had that right but nonetheless wanted to proceed before the magistrate judge, the Rule 11 allocution was administered.

During the hearing Williams stated he had recruited individuals, three of whom he named, to bring drugs from Pakistan into the United States. He further admitted he made travel and other arrangements for individuals to come to New York from Pittsburgh and that he had expected to receive a substantial amount of heroin from the illegal importation scheme. At the conclusion of the hearing, the magistrate judge stated she would recommend to the district court that in pleading guilty Williams acted voluntarily and with a full understanding of his rights. In addition, she found a factual basis for the plea and recommended to the district court that it be accepted.

When Williams subsequently learned Hajib had in fact been a government informant, his counsel made an oral motion pursuant to Fed.R.Crim.P. 32(d) to withdraw Williams' guilty plea and proceed to trial where he planned to raise entrapment as a defense. At that time the district judge stated there was no basis for the application, and continued: "[t]he allocution is clear and unmistakable. He admits his guilt." Nonetheless, the district court agreed to entertain a written motion, which it denied on March 19, 1993 finding "the defense of entrapment would not have been available to Williams because he became involved with [Hajib] and the scheme to import heroin at least six months before the government's first meeting with [Hajib]. . . . Accordingly, Williams has failed to establish a valid ground for withdrawal of his plea."

Williams was sentenced to 292 months of imprisonment, followed by five years of supervised release and a $50 special assessment. In calculating his sentence the sen-

tencing court enhanced Williams' offense level by four for being an organizer or leader of a criminal activity involving five or more participants pursuant to federal Sentencing Guidelines § 3B1.1, and deducted three levels for acceptance of responsibility. The sentencing court refused to depart downward after defense counsel argued that Williams' prior criminal history did not involve drugs or violent crime.

## DISCUSSION

Upon appeal defendant contends the taking of his plea by a magistrate judge violates the Federal Magistrates Act (Magistrates Act), 28 U.S.C. §§ 631–639 (1988), and Article III of the Constitution, that the district court erred in refusing to allow him to withdraw his guilty plea to assert the entrapment defense, erroneously enhanced his sentence as an "organizer," and wrongly refused to consider a downward departure. In the following discussion we deal with each of these issues.

### I  Allocution by Magistrate Judge

#### A.  *Under the Statute*

■ We turn first to whether the district court's referral of Williams' guilty plea allocution to the magistrate judge violated the Magistrates Act. In the 1976 amendments to the Magistrates Act, Pub.L. No. 94–577, 90 Stat. 2729, Congress authorized district court judges to assign additional duties to a magistrate. *See* 28 U.S.C. § 636(b)(3). As the legislative history of the 1976 amendments demonstrates, Congress was troubled by a series of court decisions that construed the Magistrates Act narrowly, stifling the greater use of these judicial officers by the district courts. *See* H.R.Rep. No. 1609, 94th Cong., 2d Sess. 5–6 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6162, 6164–66. The amendments accordingly reorganized the Magistrates Act in an attempt " 'to clarify and further define the additional duties which may be assigned to a United States Magistrate.' " *Gomez v. United States,* 490 U.S. 858, 867, 109 S.Ct. 2237, 2243, 104 L.Ed.2d 923 (1989) (quoting H.R.Rep. No. 1609, at 2). The revised § 636(b)(3) reads as follows: "A magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States."

The scope of § 636(b)(3) has been illuminated by two recent Supreme Court decisions. In *Gomez,* the Court held that a magistrate's conducting of a jury *voir dire without the defendant's consent* is not one of the "additional duties" a district court has authority to assign to a magistrate. 490 U.S. at 875–76, 109 S.Ct. at 2247–48. Later, *Peretz v. United States,* 501 U.S. 923, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991), explicitly ruled a district court's delegation to a magistrate of a jury *voir dire with the defendant's consent* did not violate the Magistrates Act or Article III: "The considerations that led to our holding in *Gomez* do not lead to the conclusion that a magistrate's 'additional duties' may not include supervision of jury selection *when the defendant has consented." Id.* at ——, 111 S.Ct. at 2667 (emphasis added). The Court further noted that its holding in *Gomez* was "narrow" and limited to cases in which the parties had not consented to the additional role the magistrate played. *See id.* at ——, 111 S.Ct. at 2664. The Supreme Court's analysis in *Peretz* applies to the case before us; in fact, it controls it.

In order for a Rule 11 allocution properly to fall within the sphere of "additional duties" authorized by Congress in the Magistrates Act, it must bear some relationship to those duties already assigned to magistrates by the Act. *See id.* at ——, 111 S.Ct. at 2666. An allocution is an ordinary garden variety type of ministerial function that magistrate judges commonly perform on a regular basis. The catechism administered to a defendant is now a standard one, dictated in large measure by the comprehensive provisions of Rule 11 itself, which carefully explain what a court must inquire about, what it should advise a defendant and what it should determine before accepting a plea. *See* Fed.R.Crim.P. 11(c), (d) and (f). Further, administrating an allocution is less complex than a number of duties the Magistrates Act specifically authorizes magistrates to perform. For example, such judicial officers may hear and determine pretrial matters, other than eight dispositive motions. *See* 28 U.S.C. § 636(b)(1)(A). In addition, a magistrate may conduct hearings,

including evidentiary hearings, and submit to the district court recommended findings of fact for the eight dispositive motions, and do the same with habeas petitions. *See id.* § 636(b)(1)(B).

In construing the additional duties clause as encompassing the referral to a magistrate judge of a Rule 11 allocution, we rely on the same rationale spelled out by *Peretz:* "The generality of the category of 'additional duties' indicates that Congress intended to give federal judges significant leeway to experiment with possible improvements in the efficiency of the judicial process that had not already been tried or even foreseen." 501 U.S. at ——, 111 S.Ct. at 2667. Congress evinced its purpose, the Court continued, by including a "broad residuary clause" in the Act rather than "a bill of particulars." *Id.*

The legislative history of the Magistrates Act and its various amendments supports the notion that it aims to give district courts the helping hands of a magistrate judge so as to free the district court from the burden of dealing with subordinate, but distracting, duties. *Id.* at ——, 111 S.Ct. at 2668. Use of this judicial officer, as the House Judiciary Committee explained, is encouraged by putting the authority to delegate work to it in a separate subsection, broadening the category of delegable duties beyond "pretrial matters." H.R.Rep. No. 1609, at 12, *reprinted in* 1976 U.S.C.C.A.N. at 6172; *see also* S.Rep. No. 1065, 92d Cong., 2d Sess. 3 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3350, 3351 (magistrates "render valuable assistance to the judges of the district courts, thereby freeing the time of those judges for the actual trial of cases"); H.R.Rep. No. 1629, 90th Cong., 2d Sess. 12 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4252, 4254–55 (purpose of Magistrates Act is "to cull from the ever-growing workload of the U.S. district courts matters that are more desirably performed by a lower tier of judicial officers").

Even were a magistrate's taking of a guilty plea to be viewed as an additional duty of greater importance than those duties specifically assigned to magistrates, the consent requirement—fulfilled in this case—saves the delegation. Consent is the key. *See Peretz,* 501 U.S. at ——, 111 S.Ct. at 2667; H.R.Rep. No. 287, 96th Cong., 1st Sess. 20 (1979) ("Because of the consent requirement, magistrates will be used only as the bench, bar, and litigants desire, only in cases where they are felt by all participants to be competent."). With the parties' consent, a district judge may delegate to a magistrate judge the conduct of civil and misdemeanor trials. *See* 28 U.S.C. §§ 636(a)(3), (c)(1). We think these duties comparable in responsibility and importance to administering a Rule 11 felony allocution.

Moreover, construing the additional duties clause in this fashion resolves the tension between the interests of a criminal defendant and the policies that concerned Congress and brought about its enactment of the Magistrates Act. Obviously, if a defendant objects, a magistrate judge may not conduct the allocution. But when a defendant consents to the use of a magistrate, as here, it aids an already overburdened district court in moving along its caseload of work. *See Government of the Virgin Islands v. Williams,* 892 F.2d 305, 311 (3d Cir.1989), *cert. denied,* 495 U.S. 949, 110 S.Ct. 2211, 109 L.Ed.2d 537 (1990).[1]

Further, we recognize what might appear at first blush to be an institutional conflict in our present holding with our recent decision in *In re United States,* 10 F.3d 931 (2d Cir.1993). There we held a district court cannot delegate to a magistrate judge the power to review wiretap applications. *See id.* at 936. That holding explicitly relied on Congress' plan, as expressed in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 212 (codified as amended at 18 U.S.C. §§ 2510–2521 (1988)), read in conjunction with the Electronic Communications Privacy Act of

---

1. According to the 1992 Annual Report of the Director of the Administrative Office of the United States Courts there were on September 30, 1992 a total of 43,781 pending criminal cases in the United States District Courts. In the Eastern District of New York where this case was pending there were then 1,989 cases. *See* L. Ralph Mecham, Administrative Office of the U.S. Courts, *Reports of the Proceedings of the Judicial Conference of the United States* 280 tbl. D–8 (1992).

1986, Pub.L. No. 99–508, 100 Stat. 1848 (codified as amended at 18 U.S.C. §§ 3121–3127 (1988)). *See In re United States,* 10 F.3d at 934–35. We stated in that case that while the 1976 amendments to the Magistrates Act were intended to overcome prior judicial narrowing of the additional duties clause, Congress' aim to protect individuals from an invasion of their right to privacy nonetheless was one entrusted to Article III judges, and that such aim overrode the scheme, expressed in the Magistrates Act, of increasing district court's utilization of magistrates. *See id.* at 938.

In contrast, in the case at bar, we have no contrary overriding congressional purpose that would cause us to confine the taking of guilty pleas in felony cases only to district judges. The scant evidence that Congress ever considered this issue is found in a Senate Judiciary Committee Report, which in 1979 recommended authorizing a magistrate to take such guilty pleas. *See* S.Rep. No. 74, 96th Cong., 1st Sess. 17, *reprinted in* 1979 U.S.C.C.A.N. 1469, 1486. But the Joint Conference Committee passed on doing so, pending a review by the Judicial Conference of the United States. *See* H.R.Conf.Rep. No. 444, 96th Cong., 1st Sess. 10, *reprinted in* 1979 U.S.C.C.A.N. 1487, 1491.

Of course, proposed amendments by congressional committees in 1979 that do not become law are of little value in interpreting prior legislative enactments, in the present case the Magistrates Act, amended by Congress in 1976. *See Pierce v. Underwood,* 487 U.S. 552, 566, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) ("[I]t is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means."); *Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983) (" 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one' ") (quoting *Jefferson County Pharmaceutical Ass'n, Inc. v. Abbott Labs.,* 460 U.S. 150, 165 n. 27, 103 S.Ct. 1011, 1021 n. 27, 74 L.Ed.2d 882 (1983)); *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960) (same).

We hold therefore that the "additional duties" clause of the Magistrates Act authorizes a district court judge in a felony prosecution to delegate to a magistrate judge the task of administering a Rule 11 allocution, *provided the defendant consents.*

### B. *Constitutional Challenge*

■ A defendant's consent again is the crucial difference in the constitutional analysis, because a defendant may waive even his most basic rights. *See Peretz,* 501 U.S. at ——, 111 S.Ct. at 2669. Further, the structural protections of Article III are not implicated. Because the district court remains in control of the proceeding, and the matter is reported to that court for its approval, there should be no concern that the use of a magistrate judge to allocute a defendant accused of a felony will tend to devitalize Article III courts. *See Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 850, 106 S.Ct. 3245, 3256, 92 L.Ed.2d 675 (1986). A district judge may readily read the transcript of the allocution for infirmities, if any, and may readminister the allocution if it is thought necessary. In fact, the district judge in the present case described Williams' allocution as "clear and unmistakable," stating "[h]e pled voluntarily and willingly, he gave facts of the case and he pled because he is guilty; and that's what he said."

Hence, we conclude that the referral of the taking of Williams' guilty plea to a felony by a magistrate judge did not contravene Article III of the Constitution.

### II   Withdrawal of the Guilty Plea

■ We next consider whether it was proper to refuse to allow Williams to withdraw his guilty plea after he learned Hajib was a government informant. A defendant has no absolute right to withdraw his plea of guilty. *See United States v. Rodriguez,* 968 F.2d 130, 140 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992). Fed.R.Crim.P. 32(d) states that "[i]f a motion for withdrawal of a plea of guilty . . . is made before sentence is imposed, the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason." It was Williams' burden to per-

suade the trial court that he had good grounds to withdraw his guilty plea. The findings of fact that led to the denial of the motion are subject to the clearly erroneous standard of review; the decision itself is reversed only if it constitutes an abuse of discretion. *See United States v. Vega*, 11 F.3d 309, 313 (2d Cir.1993); *see also United States v. O'Hara*, 960 F.2d 11, 13–14 (2d Cir.1992).

■ Williams insisted that the revelation that Hajib was a cooperating government informant gave him reason to withdraw his plea and proceed to trial on an entrapment defense. The district court denied this motion finding "the defense of entrapment would not have been available to Williams because he became involved with [Hajib] and the scheme to import heroin at least six months before the government's first meeting with [Hajib]." It further found "[Hajib] was not a government informant at the time that Williams had already joined the conspiracy." These findings were not clearly erroneous. After a hearing in an earlier motion brought by co-defendants seeking to dismiss their indictment on grounds of outrageous governmental conduct rising to the level of a due process violation, the district judge stated that when the government spoke to Hajib, he and Williams had already entered into their heroin importation conspiracy.

■ Entrapment is an affirmative defense that requires a defendant to prove by a preponderance of the evidence the government's inducement to commit the crime and lack of predisposition on the defendant's part. *See Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Collins*, 957 F.2d 72, 76 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 2285, 119 L.Ed.2d 210 (1992). Because Williams had become involved in the heroin conspiracy prior to Hajib's agreement with the government, the entrapment defense was foreclosed. Moreover, the district court had no obligation to conduct another hearing on this point given its familiarity with the underlying facts. *See United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir.1992) ("No hearing need be granted when the allegations on a motion to withdraw a guilty plea

before sentencing merely contradict the record, are inherently incredible, or are simply conclusory."). Hence, the denial of defendant's Rule 32 motion to withdraw his guilty plea was not an abuse of the trial court's discretion.

## III  Sentencing

Williams also raises two challenges to the sentence he received. First, he declares the district court improperly enhanced his offense level four points pursuant to Guideline § 3B1.1. His primary argument on this issue is that the sentencing court applied § 3B1.1 without making any factual findings. *See generally United States v. Stevens*, 985 F.2d 1175, 1184 (2d Cir.1993) (requiring sentencing court to make factual findings when enhancing a defendant's sentence based on his role in the offense).

■ Guideline § 3B1.1(a) allows the district court to increase a defendant's offense level by four "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (1992). In imposing Williams' sentence, the district court explicitly adopted the factual findings contained in defendant's presentence report. That report, which recommends the enhancement, documents Williams' role in the importation scheme including both his recruitment of three couriers and the involvement of three other individuals, namely his brother, father-in-law and the government's informant Hajib. As defendant admitted at his allocution, he recruited couriers for the importation scheme, three of whom he named. Counting Williams and Hajib, there were thus at least five participants in the criminal activity. We cannot say such finding is clearly erroneous. Moreover, Hajib's role as the top leader of the operation does not preclude the application of § 3B1.1 to defendant. As the Commentary makes clear, there can be "more than one person who qualifies as a leader or organizer." U.S.S.G. § 3B1.1, commentary (n. 4). The district court properly applied these straightforward standards to the facts it had found.

The defendant's second challenge to his sentence is the denial of his motion for a downward departure from the Sentencing Guidelines. Such refusal is not appealable, absent some suggestion that the sentencing court mistakenly thought it had no such authority. *See United States v. Miller*, 993 F.2d 16, 21 (2d Cir.1993); *see also United States v. Mickens*, 977 F.2d 69, 72 (2d Cir. 1992). While in this case defendant does argue that the court mistakenly believed it could not depart, this argument is without merit. After defense counsel suggested the sentencing court could downwardly depart from the Guidelines, it responded: "Of course. I do it for him, I have to do it for everybody. No. No. No. Your argument is not fair." This comment does not indicate that the district court thought it could not depart; rather, it simply refused to do so in this case. Hence, the refusal to depart downward is not reviewable.

## CONCLUSION

Accordingly, the judgment of the district court is affirmed.