**UNITED STATES of America,**

v.

**Mark SHAPIRO.**

**No. 3:98CR242 (AVC).**

United States District Court, D. Connecticut.

Jan. 4, 2001.

M. Hatcher Norris, Butler, Norris & Gold, Hartford, CT, Martin K. Leppo, Randolph, MA, Robert M. Goldstein, Quincy, MA, for Mark A. Shaprio.

Nora R. Dannehy, U.S. Attorney's Office, Hartford, CT, John A. Danaher, III, Stephen C. Robinson, U.S. Attorney's Office, New Haven, CT, for U.S.

### RULING ON THE DEFENDANT'S MOTION FOR RECONSIDERATION IN RE MOTION TO WITHDRAW GUILTY PLEA

COVELLO, Chief Judge.

On December 9, 1998, the defendant appeared before the court, waived his right to be indicted and pleaded guilty to a two-count information charging him with bank fraud, in violation of 18 U.S.C. § 1344, and Klein conspiracy, in violation of 18 U.S.C. § 371. The plea was tendered pursuant to a written plea and cooperation agreement with the government.

On April 21, 2000, the defendant moved to withdraw his guilty plea pursuant to Rule 32(e) of the Federal Rules of Criminal Procedure and moved for an evidentiary hearing. The defendant claimed to be innocent and to have been pressured into pleading guilty by a secret government promise to withhold prosecution of his wife in exchange for his plea, and a cooperation agreement in which the government promised to recommend a reduced sentence, but later terminated.

On June 22, 2000, the court denied the motion, concluding that the defendant failed to present fair and just reasons authorizing a withdrawal of the plea and that, in addition, the defendant failed to present significant questions concerning the voluntariness of the plea to authorize an evidentiary hearing.

On July 7, 2000 the defendant filed a motion seeking reconsideration of that order. On July 28, 2000, the court granted the motion, concluding that the defendant had presented significant questions concerning the voluntariness of the plea to justify an evidentiary hearing. The issues presented for hearing were: (1) whether the government secretly agreed to withhold prosecution of the defendant's wife, Susan Shapiro, in exchange for the defendant's guilty plea and if so, whether such an agreement was justified; and (2) whether the government breached the cooperation agreement in bad faith.

On August 21, 2000, and September 8, 2000, the court heard evidence on the motion. Having considered that evidence and the issues presented, the court finds: (1) the defendant has failed to present sufficient evidence demonstrating an agreement whereby the government agreed to withhold prosecution of a third party in exchange for the defendant's guilty plea; and (2) the government did not breach the cooperation agreement in bad faith. Accordingly, the court concludes that the defendant has failed to make the required showing of fair and just reasons authorizing a withdrawal of the plea. The motion is therefore denied.

### FINDINGS OF FACT

On December 9, 1998, the government filed an information alleging that Mark Shapiro ("the defendant") violated the federal bank fraud statute, 18 U.S.C. § 1344, by orchestrating a scheme to defraud a federally insured savings bank of approximately $5.85 millions in loans. The information also alleged that the defendant owned several real estate development companies with other unnamed individuals and that he conspired with them to divert company receipts to himself and others by keeping false books and records, and failed to report such income on his individual tax return, all in violation of 18 U.S.C. § 371 ("Klein conspiracy").

## I

### THE PLEA AGREEMENT

#### A. *The Guilty Plea*

On December 9, 1998, the defendant entered a plea agreement with the government. The agreement contained a stipulation of offense conduct in which the defendant admitted to his involvement in the bank fraud and Klein conspiracy. In addition, the defendant admitted that he: (1) committed bankruptcy fraud; (2) defrauded the U.S. Department of Housing and Urban Development in violation of 18 U.S.C. § 1010; and (3) that he defrauded a partnership by fraudulently endorsing a check payable to that partnership, deposited the proceeds into a checking account at First National Bank controlled by his wife, Susan Shapiro, and then diverted a portion of those funds to his own account.

The plea agreement recites that "no... promises, agreements, or conditions have been entered into other than those set forth in [the] agreement" and that no other promises would be entered into "unless set forth in writing, signed by all the parties." (See December 9, 1998 Plea Agreement at 6). The agreement was executed by and among the defendant, the defendant's counsel, M. Hatcher Norris, and the government, by and through Assistant U.S. Attorney Nora R. Dannehy.

#### B. *The Plea Allocution*

On the same day, i.e., December 9, 1998, the defendant appeared with Attorney Norris before U.S. District Judge Dominic J. Squatrito for hearing on his election to waive indictment and plead guilty to the information. During the hearing, the defendant represented to the court that he had discussed "each and every aspect" of the information and plea agreement with his attorney, and that he understood the rights he would be waiving. (Transcript of Guilty Plea Hearing in re Mark Shapiro ("Shapiro Tr.") at 10–13 dated 12/9/98). The defendant also described in his own

words his conduct giving rise to the charges, stating:

> Shapiro: In the first court, myself and another individual used improper information to induce a bank to make a loan on a piece of property that they owned for our benefit to purchase the piece of real estate.

> Court: By improper information?

> Shapiro: False information.

> Court: As a result of that did the bank sustain a loss.

> Shapiro: Yes, sir.

> . . . .

> Court: And as to count two of the second count?

> Shapiro: Myself and another individual improperly reported our income, obstructing it from the U.S. Government, and I agreed to do this with the other individual.

(Shapiro Tr. at 38). The defendant also specifically acknowledged, on pain of perjury [1], that no one had made any promises to him other than those articulated in the plea agreement.

> Court: Mr. Shapiro, does this written [plea] agreement that is outlined by Nora Dannehy fully and accurately reflect your understanding of the agreement that you have entered into with the government?

> Shapiro: Yes.

> Court: Except for the promises contained in that written agreement, has anyone made any promises that caused you to plead guilty?

> Shapiro: No.

(Shapiro Tr. at 22). Further, the court inquired as to whether the defendant had been exposed to any threat or coercion, specifically asking:

[1]. The Court: Now, do you understand, sir, that now, having been duly sworn, your answers to my questions at any time during these proceedings will be subject to penalties for perjury or for making a false statement if you do not answer truthfully?

> Court: Is this plea agreement the result of force or threats used against you or anyone near and dear to you?

> Shapiro: No.

(Shapiro Tr. at 27).

At the conclusion of the hearing, after being advised that he could not withdraw a guilty plea, the defendant nevertheless stood and tendered his guilty plea.

## C. Withdraw Of The Guilty Plea & The "Secret Agreement"

Some seventeen months after the plea allocution, Attorney Norris withdrew as the defendant's counsel. The defendant hired new counsel and, on April 7, 2000, he notified Judge Squatrito of his intention to move to withdraw his guilty plea. On April 18, 2000, Judge Squatrito transferred the matter to this court for all further proceedings.

On April 24, 2000, the defendant filed his motion to withdraw the plea, asserting that although he was innocent, he was pressured into pleading guilty by a secret agreement with the government in which the government promised to withhold prosecution of his wife in exchange for his plea. His claims, however, were contradicted by his own statements under oath. As set forth above, the defendant specifically acknowledged at the allocution that the written plea agreement constituted the entire agreement and that no promises outside the agreement or coercion were involved in his decision to plead guilty.

To convince the court that he had lied at the allocution and not in his motion to withdraw, the defendant submitted an affidavit in which he claimed that his counsel, Attorney Norris, had told him of the government's threat and subsequent promise.

> Shapiro: Yes.

(Transcript of Guilty Plea Hearing in re Mark Shapiro at 4, dated 12/9/98)

While such evidence is insufficient to shoulder the heavy burden the law imposes of proving a bargain outside the record and contrary to his own statements under oath, *see e.g., United States v. Nuckols,* 606 F.2d 566, 568–69 (5th Cir.1979), the defendant offered additional evidence to support his claim. Specifically, he pointed to a portion of the plea allocution that hinted of an agreement outside the record. In this regard, during the allocution, Judge Squatrito reviewed the stipulation of offense conduct with the defendant that recited how the defendant had fraudulently endorsed a check in the amount of $84,597.20 payable to a dissolved partnership of which the defendant had no affiliation. The stipulation stated that the defendant then deposited the proceeds of that check into an account at First National Bank ("FNB") under the name of Laundry Management Services. The only authorized signatory on the Laundry Management Services account was the defendant's wife, Susan Shapiro, and shortly after making the deposit, the stipulation stated that the defendant transferred a portion of those funds, i.e., $42,298.50, to an account under his control at FNB. Judge Squatrito questioned this portion of plea agreement (the "Norris colloquy"), stating:

> Court: There is a statement in the [stipulation of offense conduct] that your wife was a conduit or involved in this, some-
>
> Shapiro: Isn't there.
>
> Norris: [Counsel for the defense]: I don't believe-yes.
>
> Court: Is that your wife?
>
> Norris: [Counsel for the defense]: Well, it only indicates that she was- and that happens to be a fact, that she was the only authorized signatory on an account in which certain funds were deposited. That's a fact. We stipulate to it.
>
> Court: I'm just letting you know she is somewhat implicated in this. Whether or not there's any criminal liability is a different issue, but she somehow was involved in this scheme.
>
> Norris: [Counsel for the defense]: Right. And I would state, your Honor, again in the Court's canvass of Mr. Shapiro, consideration of all this, *this has been addressed by Mr. Shapiro, has been the subject of discussion.*
>
> Court: As long as people are awake and aware. As soon as I see a name on there, I want to make sure he understands, and that's why I went through the cooperation issue with him. You never know where the dust is going to settle on something like this.
>
> Norris: [Counsel for the defense]: I agree. But we—I want to indicate to your Honor that *whether-where the dust does settle in this has been anticipated by Mr. Shapiro and his counsel and has been addressed by us with the government. I don't want the Court to think we had not addressed it.*

(Shapiro Tr. at 25–27) (emphasis added).

Because Attorney Norris had stated on the record that Susan Shapiro's situation had been "addressed" but had failed to specify the manner, the court could not rule out that the parties had "addressed" the situation with the claimed secret agreement. Therefore, the court concluded that the defendant had offered sufficient evidence to authorize an evidentiary hearing.

■ At the hearing, the defendant carried a heavy burden. To successfully withdraw his plea, he would have to show that the plea was induced by unlawful government coercion. *See e.g., Harman v. Mohn,* 683 F.2d 834, 837 (4th Cir.1982). In the

Second Circuit, it is not unlawful for the government to pressure a defendant into pleading guilty by threatening to prosecute a third party. *United States v. Marquez,* 909 F.2d 738, 741 (2d Cir.1990) (government may threaten to prosecute a defendant's wife if defendant did not accept plea bargain). Government pressure becomes unlawful coercion when the government would have been without cause to charge the third party. *See Marquez,* 909 F.2d at 741 (prosecutor's threat of third party prosecution must be justifiable); *Harman,* 683 F.2d at 837 (prosecutor may not induce guilty plea by means of threatening to indict and prosecute the wife of an accused without probable cause). Consequently, for the defendant to withdraw his guilty here, he was required to prove not only that the government promised to withhold prosecution of a third person in exchange for his guilty plea, but as well that the government would have been without cause to do so.

D. *Evidentiary Hearing*

On August 21, 2000 and September 8, 2000, the court heard evidence on the motion to withdraw the plea. The evidence included the testimony of the defendant's original counsel, Attorney Norris, the attorney employed by Susan Shapiro, Attorney James Cowdery, and the defendant himself. The defendant testified that although he was innocent, he lied under oath and pleaded guilty to spare not only his wife from prosecution, but as well his father-in-law, Stuart Kessler. The defendant claimed that, based on his understanding of the events just prior to the plea, the government had agreed to withhold prosecution of his family and business associates in exchange for his guilty plea. The bargain, according to the defendant, was brokered by his counsel, Attorney Norris. While the evidence did support a finding that the defendant and the government reached an agreement through Attorney Norris in which the government agreed to terminate the grand jury investigation in exchange for the defendant's guilty plea, there was simply never an agreement whereby the government agreed to withhold prosecution of a third person in exchange for the plea.

As disclosed at hearing, in 1997, the government was looking at the defendant's role in a scheme to defraud the New Haven Savings Bank as part of a grand jury investigation. The government was also investigating the defendant's role in a scheme to defraud the Internal Revenue Service through the filing of false tax returns, including joint returns with Susan Shapiro for the tax years 1994 and 1995, as well as the defendant's activities relating to various companies which he owned and/or with which he was associated, including SKS Mortgage Company and Laundry Management Services. Susan Shapiro was the president of SKS Mortgage Company and, on paper, she owned the company. She was the signatory on certain corporate accounts and had signed promissory notes for certain loans provided to SKS by First National Bank. Susan Shapiro was also the only authorized signatory on a Laundry Management Services account at First National Bank in which the government believed the defendant had deposited fraudulently procured funds. Similarly, the defendant's father-in-law, Stuart Kessler, was affiliated with companies subject to the government's investigation, including SKS where Kessler was listed as secretary. Kessler also had a personal relationship with the main stockholder of First National Bank and might have received loans on favorable terms as a result of that relationship.

Both Susan Shapiro and Stuart Kessler were served with subpoenas and asked to present documentary evidence before the grand jury. Both retained defense counsel and both responded.[2] Susan Shapiro's de-

---

**2.** Stuart Kessler provided the grand jury with documents relating to SKS. Susan Shapiro, however, did not present any evidence because the government was informed through

fense counsel, Attorney Cowdery, testified that the government specifically told him that Susan Shapiro was not targeted for criminal prosecution but that her husband was such a target. Further, the defendant's own lawyer, Attorney Norris (the alleged broker of the bargain) testified that there was never an agreement to spare Susan Shapiro and others from prosecution in exchange for the defendant's guilty plea. The government did agree, however, to terminate the grand jury investigation in exchange for the defendant's guilty plea. In a letter addressed to the defendant, Attorney Norris wrote the following:

> I have attempted to contact you via your beeper and have been unable to reach you. On Monday, September 14, 1998, I did speak to Assistant United States Attorney Nora Dannehy. She and I have been speaking over the last couple of weeks and I had told her that I planned to meet you but, as you are aware, you canceled those meetings. She indicates that the government is willing to wait no longer and if she has not heard from me by Thursday of this week, that is September 17, 1998, to the effect that you wish to enter into the plea that is proposed, she will immediately serve additional Grand Jury Subpoenas on your wife and proceed to complete the Grand Jury investigation and present the case for indictment.

(September 14, 1998 Letter from Attorney Norris to Mark Shapiro) As the above letter indicates, the government planned to continue the grand jury investigation, including its investigation with respect to Susan Shapiro, unless the defendant tendered his plea.

The defendant testified that he misunderstood the letter to mean that the government would proceed to indict his wife unless he pleaded guilty, even though the letter says nothing of indictment and

speaks only of a grand jury investigation. The misunderstanding, the defendant claims, was due to the fact that Attorney Norris never explained to him the distinction between being a target of a grand jury investigation and being a witness before a grand jury.

The court finds the defendant's purported misunderstanding incredulous, especially given his admission that he has been less than truthful in the past and, in addition, because the record reflects that, indeed, the defendant was told the meaning of the term "target" prior to his election to plead guilty. Specifically, on July 1, 1998, the defendant testified before the grand jury. As part of that testimony, the government asked the defendant the following questions:

> Government: Are you aware that you are what is called a target of that investigation?
>
> Shapiro: Yes.
>
> Government: By target, just so we are all clear on this, what that means is that you are a person who the United States Attorney's Office and the Grand Jury has substantial evidence linking you to the commission of a crime and who, in my judgment, is an alleged or possible defendant in a case, do you understand that?
>
> Shapiro: Yes I do.

(Grand Jury Transcript, July 1, 1998 at 2–3).

## II

## THE COOPERATION AGREEMENT AND ITS BREACH

### A. The Cooperation Agreement

In an effort to obtain a recommendation from the government for a reduced sen-

---

her defense counsel, Attorney Cowdery, that she was not the custodian of records for ei-

ther SKS or Laundry Management Services.

tence, the defendant entered into a cooperation agreement. In the agreement, the defendant agreed to cooperate fully with the government and special agents of the Federal Bureau of Investigation and Internal Revenue Service, and to disclose fully and truthfully all information concerning his knowledge of and participation in criminal activities by himself and others including bank officers at the FNB. Further, the defendant acknowledged when signing the agreement that he understood that "his cooperation, testimony, statements, information and other assistance... must be fully truthful, accurate and complete" and that "if the government determine[d] that [he] has intentionally given false, misleading or incomplete information or testimony; ...failed to cooperate fully; or otherwise ...violated any provision of th[e] agreement, then the [g]overnment [could] deem th[e] agreement null and void." (December 9, 1998 Cooperation Agreement at 1–3). Like the plea agreement, the cooperation agreement was executed by and among the defendant, the defendant's counsel, M. Hatcher Norris, and the government, by and through Assistant U.S. Attorney Nora R. Dannehy.

## B. The Plea Allocution and The Cooperation Agreement

During the plea allocution, Judge Squatrito reminded the defendant that, in connection with the cooperation agreement, the government had the discretion to determine whether his assistance constituted cooperation, specifically stating that,

> Court: Does [the defendant] understand that he's signing this cooperation agreement, that there's certain things that you have to do within the cooperation agreement and it's within the discretion of the prosecution to determine whether or not you fully cooperated and that even if you do everything you think is correct if in their reasonable discretion, they don't think you did, then you

> don't get a 5K1.1, which is a potential for a downward departure by the court? Do you understand that, sir?

> Shapiro: Yes, sir.

## C. The Defendant's Cooperation

Soon after tendering his plea, the defendant began meeting with the government in connection with the cooperation agreement. In furtherance of that agreement, in February of 1999, the defendant agreed to telephone a FNB officer whom the government suspected of aiding and abetting the defendant (hereinafter, "the FNB suspect"), in an attempt to elicit incriminating statements from him. The FBI asked the defendant to telephone the FNB suspect from FBI offices in Fairfield, Connecticut. The defendant claims that he questioned the plan, as he normally telephoned the FNB suspect only from his home or cellular phone, and believed that the FNB suspect's caller ID system would reveal his location. Moreover, he never discussed business with the FNB suspect over the phone.

The FBI purportedly ignored the defendant's concerns and pressed him to make the call. With the call, the defendant claims that the FNB suspect became suspicious and asked him "where are you calling from." After the call was terminated, the defendant asserts that one of the FBI agents made a comment to the effect of "oh, he knows, this is no good." Two weeks after the call, the government advised him that the cooperation agreement was null and void. The defendant speculates that the government voided the agreement because the FNB suspect discovered that the defendant was cooperating with the government, making his assistance useless.

The government, on the other hand, denies that it terminated the cooperation agreement because of the defendant's failure to provide useful information. The government insists that, as agents told the defendant on March 26, 1999, the govern-

ment terminated the cooperation agreement because the defendant withheld information from them and lied to them during the period when he was obligated to cooperate.

## D. *The Defendant Breaches The Cooperation Agreement*

As set forth by the government, the defendant breached the cooperation agreement by withholding information concerning a transaction in which he, through the assistance of FNB, evaded the payment of over $300,000 in taxes involving an entity he created called Orlando Partners Trust. Specifically, in April of 1998, the defendant held an outstanding loan from FNB in the amount of $945,000. FNB initiated a collection action against him and, on May 19, 1998, the defendant entered into a stipulated judgment with the bank whereby he agreed to make two payments of $204,000 to satisfy the loan. The stipulation stated that a judgment for $945,000 will be satisfied if the two payments totaling $204,000 were made by a certain date. The judgment also contained a provision authorizing FNB to assign the note to the defendant's wife or her nominee.

Between May 19, 1998, and June 24, 1998, FNB contacted the defendant and told him that the bank would accept $110,000 in satisfaction of the loan. The defendant did not provide the government with a reason for the sudden reduction. The defendant borrowed the money from his wife's personal account and delivered it to his attorney in three checks$100,000; $10,000 and $15,000. The defendant told government agents that the $15,000 was for his attorney's legal fees and that the remaining $110,000 went to FNB to pay off the loan.

The defendant initially told the government that through the transaction described above, Susan Shapiro had purchased the note from the bank. The defendant then claimed that it was either his wife or her trust that bought the note so that a taxable event would

not be triggered. The defendant never paid his wife nor did she make a demand for any payment on the note. FNB never issued a 1099 (forgiveness of debt) to the defendant and thus no taxable event was ever triggered for the defendant. The government inquired on several occasions as to how the deal was structured. The defendant provided no additional information regarding the structure of the deal to evade taxes.

The government later obtained files from the defendant's transactional and trust lawyers as well as the bank's lawyer. The file held by the defendant's trust lawyer contained trust documents executed by the defendant concerning the FNB transaction. The documents indicated that, on December 17, 1998, eight days after tendering his guilty plea to Judge Squatrito, the defendant, using the services of another lawyer, created an entity called Orlando Partners Trust and, that on December 17, 1998, Orlando Partners Trust entered into an option agreement with Susan Shapiro to purchase the note for $110,000.

In essence, this transaction meant that the defendant would end up holding the note, owe nothing on the note and have successfully evaded paying taxes. At no time did the defendant inform the government of this aspect of the transaction, despite repeated requests as to how the note was purchased and where the payment schedule on the note stood. The files did not have any documents reflecting a $15,000 payment for legal fees.

On March 26, 1999, federal agents confronted the defendant with this information. The defendant did not deny that he withheld information in violation of the cooperation agreement. Moreover, the defendant admitted that he had lied about the $15,000 payment for legal fees, confessing that he had kept the money for himself. The government explained to the defendant that these acts constituted a breach of the cooperation agreement and that the agreement was void.

According to the defendant's original counsel, Attorney Norris, the government informed him that the cooperation agreement was terminated because the defendant had failed to disclose an agreement involving a trust he had created for the purchase of the note from his wife and had set up the trust shortly after the issue of forgiveness of debt was raised by federal agents in a cooperation meeting and also because the defendant had misrepresented during the cooperation agreement the disposition of a particular $15,000 that the defendant originally stated was used for attorneys fees.

At hearing, the defendant admitted that he did not tell the government about the creation of Orlando Partners Trust until confronted by the government on March 26, 1999. The defendant also admitted to providing false information to the government regarding his use of $15,000.

### CONCLUSIONS OF LAW

The defendant argues that he should be permitted to withdraw his guilty plea because he is innocent and pleaded guilty only because the government promised him: (1) that it would withhold prosecution of his wife and father-in-law; and (2) that he would be offered a cooperation agreement and, in this way, receive a recommendation for a reduced sentence. The defendant asserts that, because he was pressured into pleading guilty out of a concern for his family and, in any event, the government has now revoked the cooperation agreement in bad faith, the court should allow him to withdraw his guilty plea. As set forth more fully below, the court is unpersuaded that there exists a fair and just reason authorizing a withdrawal of the plea. Accordingly, the motion is denied.

■ "Motions to withdraw guilty pleas before sentencing are governed by Federal Rule of Criminal Procedure 32(e)." *United States v. Torres*, 129 F.3d 710, 715 (2d Cir.1997). Although Rule 32(e) provides that "a defendant may move

to withdraw a guilty plea upon a showing of a 'fair and just reason,' it is basic that 'a defendant has no absolute right to withdraw his guilty plea.'" *Id.* (quoting *United States v. Williams*, 23 F.3d 629, 634 (2d Cir.1994)). "Rather, the defendant has the burden of satisfying the trial judge that there are valid grounds for withdrawal, taking into account any prejudice to the government." *United States v. Lasky*, 23 F.Supp.2d 236, 239 (E.D.N.Y.1998). For a defendant to make a showing of "valid grounds," that is, a fair and just reason, he "must raise a significant question about the voluntariness of the original plea." *Torres*, 129 F.3d at 715. The factors assessed are: "(1) the defendant's proffered reasons; (2) whether there has been an assertion of legal innocence and the amount of time that has elapsed between the plea and the motion to withdraw; and (3) whether the government would be prejudiced by the motion." *Lasky*, 23 F.Supp.2d at 239.

Applying the factors set forth above, the court concludes that no "fair and just reason" exists to justify a withdraw of the plea.

### (1) *The Defendant's Proffered Reasons*

A. The "Secret Agreement."

■ The evidence at hearing demonstrated that the government never agreed (secretly or otherwise) to withhold prosecution of Susan Shapiro, Stuart Kessler or anyone else in exchange for the defendant's plea of guilty. The evidence did demonstrate, however, that the government agreed to terminate the grand jury investigation in exchange for the defendant's guilty plea. The defendant maintains that he reasonably misunderstood this agreement as an agreement to withhold prosecution of Susan Shapiro and/or Stuart Kessler in exchange for his plea because: (1) his counsel, Attorney Norris, never discussed the difference between being the subject of a grand jury subpoena versus being the target of a grand jury

investigation; (2) he is a lay person without formal legal training; (3) his counsel, Attorney Norris, wrote to him and intimated that the defendant's family would be subject of the grand jury investigation; and (4) in the defendant's view, an indictment of either Susan Shapiro or Stuart Kessler was reasonable, as both individuals carried official roles in companies subject to investigation and, the status of each individual could have changed if the grand jury process was allowed to proceed in the absence of his plea.

Assuming for purposes of discussion only that the defendant reasonably believed that he was pleading guilty to spare his wife and father-in-law from government prosecution,[3] the defendant's belief, however coercive, does not render his election to plead guilty involuntary or otherwise invalid. In the Second Circuit, a plea agreement may be reached "in response to a prosecutor's justifiable threat to prosecute a third party if the plea is not entered." *United States v. Marquez,* 909 F.2d 738, 741 (2d Cir.1990). Such agreements are often reached on promises by the government to withhold prosecution or provide favorable treatment to a defendant's spouse. *See e.g., Marquez,* 909 F.2d at 741 (government would offer defendant's wife a plea bargain only if defendant pleaded guilty). A federal court will not recognize such a bargain, however, when there is proof that the government would have been without cause to charge the third party. *Harman,* 683 F.2d at 837 (prosecutor may not induce guilty plea by means of threatening to indict and prosecute the wife of an accused without probable cause).

Here, assuming that the government's promise to end the grand jury investigation constituted a promise to withhold prosecution of Susan Shapiro and Stuart Kessler, and the defendant accepted this promise in exchange for his guilty plea,

such a bargain would be completely lawful unless the defendant was also able to show that the government would have been without cause to charge Susan Shapiro and Stuart Kessler. The defendant simply failed to present any evidence on this issue and, to the contrary, argued that his misunderstanding of the bargain was due in part to his perceived reasonableness of such a charge. Accordingly, there is no ground for the conclusion that the guilty plea was made under invalid conditions.

There was also no evidence that the pleas was involuntarily tendered. The hearing transcript reveals that, at the time of the guilty plea, the court conducted an exhaustive allocution with the defendant. There, the court established that the defendant fully understood the charges against him and the rights that he would be waiving as a result of pleading guilty. The court questioned the defendant with respect to the plea agreement, and the defendant stated that he had reviewed the plea agreement with his attorney and that the agreement met with their approval. Assuming that the defendant reasonably believed that he was tendering his plea in exchange for a government agreement to withhold prosecution of Susan Shapiro and Stuart Kessler, the record of that colloquy does not reflect any dissatisfaction with the arrangement. The defendant was given every chance by Judge Squatrito to raise any concerns, questions or anxieties about the plea. The court is therefore persuaded that the defendant fully acknowledged the voluntariness of his plea and that the plea was made with full knowledge of all the circumstances. Accordingly, the defendant has failed to make the required showing of fair or just reasons authorizing a withdrawal of the guilty plea.

### B. The Cooperation Agreement

The defendant next asserts that the government voided the cooperation agree-

---

**3.** As set forth in the court's findings of fact, *supra,* the court has found that the defendant did not suffer from such a misunderstanding.

The court will assume there was a misunderstanding for purposes of discussion only.

ment in bad faith and therefore, he should be permitted to withdraw his guilty plea. Specifically, the defendant asserts that the government voided the agreement after determining that his further cooperation would be useless since the FNB suspect had discovered that he was cooperating. The government, by its account, denies that it terminated the cooperation agreement because of the defendant's failure to provide useful information and maintains that, as the government informed him on March 29, 1999, the government voided the agreement because he withheld information from them during their investigation. Specifically, as set forth by the government, the defendant breached the cooperation agreement by withholding information concerning a transaction in which he, through the assistance of FNB, evaded the payment of over $300,000 in taxes involving an entity he created called Orlando Partners Trust, and lied to the government concerning his use of a particular $15,000.

 Ordinary principles of contract law apply to plea and cooperation agreements. *United States v. Hon,* 17 F.3d 21, 26 (2d Cir.1994). While contract principles guide the interpretation of these agreements, they "do not govern the available remedies for breach." 1-95–CV–553–P1 v. 1–95–CV–553–D1, 75 F.3d 135, 136 (2d Cir. 1996) (*citing Santobello v. New York,* 404 U.S. 257, 262–63, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) and *United States v. Bohn,* 959 F.2d 389, 391 (2d Cir.1992)). Where the government is in breach, the defendant can seek specific performance or withdraw his plea. *Id.* at 136–37. Where, on the other hand, the defendant is in breach, the government is relieved of its obligations under the agreement but the defendant may not withdraw his plea. *Hentz v. Hargett,* 71 F.3d 1169 (5th Cir.1996). The government's decision to void a cooperation agreement must be made in good faith. *United States v. Resto,* 74 F.3d 22, 25 (2d Cir.1996).

The cooperation agreement in this case gave fair notice to the defendant that "his cooperation, testimony, statements, information and other assistance... must be fully truthful, accurate and complete" and that "if the government determine[d] that [he] has intentionally given false, misleading or incomplete information or testimony; ...failed to cooperate fully; or otherwise ...violated any provision of th[e] agreement, then the [g]overnment [could] deem th[e] agreement null and void." (December 9, 1998 Cooperation Agreement at 1–3). Moreover, at the guilty plea hearing, the court specifically advised the defendant that:

Court: Does [the defendant] understand that he's signing this cooperation agreement, that there's certain things that you have to do within the cooperation agreement and it's within the discretion of the prosecution to determine whether or not you fully cooperated and that even if you do everything you think is correct if in their reasonable discretion, they don't think you did, then you don't get a 5K1.1, which is a potential for a downward departure by the court? Do you understand that, sir?

Shapiro: Yes, sir.

(Shapiro Tr. at 17).

At hearing on the motion to withdraw the plea, the defendant admitted that he did not tell the government about the creation of Orlando Partners Trust until confronted by the government on March 26, 1999. The defendant also admitted to providing false information to the government regarding his use of $15,000. Because the cooperation agreement specifically stated that the government could terminated the agreement if it determined that the defendant gave false, misleading or incomplete information, and the evidence demonstrated that, indeed, the defendant did provide such false and misleading information, the court concludes that the government did

not terminate the agreement in bad faith. Because there is no evidence that the agreement was terminated in bad faith, there is no fair and just reason presented here for authorizing a withdrawal of the guilty plea.

### (2) *Legal Innocence & Timing*

In assessing whether fair and just reasons exist to authorize a withdraw of a guilty plea, courts also consider the circumstances surrounding any assertion of legal innocence and the timing of the assertion. *See e.g., United States v. Joslin,* 434 F.2d 526, 530 (D.C.Cir.1970) (district court erred in denying motion to withdraw guilty plea where a defendant, charged with burglarizing a senator's home, failed to point out the house during a tour of houses he admitted to burglarizing, and where the defendant claimed innocence within a day after pleading guilty); *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997) (district court did not abuse discretion in denying motion to withdraw guilty plea where evidence demonstrated that, among other things, the defendant waited over seven months to move formally to withdraw his plea).

In this case, the circumstances surrounding the defendant's assertion of innocence do not militate in favor of authorizing a withdraw of the guilty plea, especially where, as here, the defendant waited over seventeen months after pleading guilty to claim his innocence.

### (3) *Prejudice To The Government*

In determining whether fair and just reasons exist to authorize a withdraw of a guilty plea, the court may consider any prejudice to the government. *United States v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir.1992). The government, however, need not demonstrate prejudice where the defendant fails to show sufficient grounds to justify withdrawal of the plea. *Id.; see also United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997).

Because the defendant has failed to show sufficient grounds to justify withdrawal of the plea, the court need not consider the prejudice that would certainly inure to the government with a withdrawal of the guilty plea.

### *CONCLUSION*

It is hereby ordered that the defendant's motion for reconsideration is GRANTED (document no. 44). As set forth above, the relief requested is DENIED. The Court's June 22, 2000 ruling denying the defendant's motion to withdraw his guilty plea is therefore affirmed for the reasons set forth herein. The defendant is ordered to appear for sentencing on Thursday, January 25, 2001 at 11:00 am.